# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| OWL CREEK I, L.P., OWL CREEK II, L.P., OWL CREEK SRI MASTER FUND, LTD., and OWL CREEK OVERSEAS MASTER FUND, LTD., | ) ) ) ) ) | CIVIL ACTION NO. |
| Plaintiffs, | ) ) | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND THE COMMON LAW** |
| v. | ) ) ) | |
| OCWEN FINANCIAL CORPORATION, WILLIAM ERBEY, and RONALD FARIS, | ) ) ) ) | |
| Defendants. | ) ) ) | JURY TRIAL DEMANDED |

Plaintiffs Owl Creek I, L.P., Owl Creek II, L.P., Owl Creek SRI Master Fund, Ltd., and Owl Creek Overseas Master Fund, Ltd. ("Plaintiffs") are investment funds which purchased the common stock of Defendant Ocwen Financial Corporation ("Ocwen" or the "Company"). Plaintiffs, through their undersigned attorneys, by way of this Complaint and Jury Demand, bring this action against Ocwen and certain of its former and present officers and directors, Defendants William Erbey ("Erbey") and Ronald Faris ("Faris" and, collectively with Erbey, the "Individual Defendants"), and allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief is based on, *inter alia*, an investigation by their attorneys, which includes, among other things, a review and analysis of: Ocwen's filings with the U.S. Securities and Exchange Commission ("SEC"); a January 20, 2016 SEC order instituting a settled administrative proceeding against Ocwen (the "SEC Consent Order"); an

October 5, 2015 SEC order instituting a settled administrative proceeding against Ocwen's affiliate, Home Loan Servicing Solutions Ltd. (the "HLSS Consent Order"); various letters sent by the Superintendent of the New York State Department of Financial Services (the "NYDFS") to Ocwen; consent orders and agreements between Ocwen, Ocwen Loan Servicing LLC, and the NYDFS; the National Mortgage Settlement (the "NMS") and related public filings; several reports issued by Joseph A. Smith, Jr. concerning Ocwen's compliance with the NMS; pleadings, motion papers, and exhibits to declarations filed in the matter *In re Ocwen Financial Corp. Securities Litigation*, Case No. 14-cv-81057-WPD (S.D. Fla.) (the "Class Action Proceeding"); decisions, opinions and orders issued by the Court in the Class Action Proceeding; pleadings, motion papers, and exhibits to declarations filed in the matter *Broadway Gate Master Fund, Ltd., et al. v. Ocwen Financial Corp., et al.*, Case No. 16-cv-80056-WPD (S.D. Fla.) (the "Broadway Gate Proceeding"); decisions, opinions and orders issued by the Court in the Broadway Gate Proceeding; pleadings, motion papers, and exhibits to declarations filed in the matter *Consumer Financial Protection Bureau v. Ocwen Financial Corp. et al.*, Case No. 17-cv-80495-KAM (S.D. Fla.) (the "CFPB Proceeding"); and other public documents and media reports concerning Ocwen and its affiliates.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      Plaintiffs bring this action under the federal securities laws and under the common law to recover the investment losses they suffered as a result of numerous false and misleading statements that Ocwen and its executives made to induce Plaintiffs to purchase the common stock of Ocwen.   Plaintiffs suffered significant investment losses when a series of partial corrective disclosures were made to the market and the price of Ocwen's common stock plummeted as a result.

2.      Ocwen is a mortgage servicing company based in Florida which was founded and – until recently – led by Defendant Erbey.  Erbey has since been forced to resign his position. Defendant Erbey's right-hand man in running Ocwen was his long time compatriot, Defendant Faris.

3.      Plaintiffs are investment funds managed by a common adviser based in New York.

4.      In 2014, Defendants sought to induce Plaintiffs to invest in Ocwen.  Rather than providing accurate information about the company, however, Defendants made numerous misrepresentations to Plaintiffs' investment adviser to induce Plaintiffs to purchase Ocwen stock.

5.      Over the course of 2014, Defendants induced Plaintiffs to purchase tens of millions of dollars of Ocwen stock by making false and materially misleading statements concerning the accuracy of Ocwen's financial statements, its purported regulatory compliance, and the effectiveness of its internal controls and disclosure procedures.

6.      For example, Defendants misrepresented that Ocwen's financial statements were prepared in accordance with generally accepted accounting principles, and that Ocwen had implemented effective controls over financial reporting required to ensure that its financial statements were correctly prepared.  In August 2014, however, Ocwen disclosed that in 2013 and

the first quarter of 2014, it had improperly accounted for the sale of millions of dollars of mortgage servicing rights. Ocwen also admitted that – contrary to its prior representations – its internal controls over financial reporting contained a material weakness. As a result of the admittedly improper accounting, Ocwen materially overstated its income for the first quarter of 2014, and was forced to restate its financial statements for the relevant periods.

7.        Defendants also made false and misleading statements concerning Ocwen's regulatory compliance. As a mortgage servicer, Ocwen is heavily regulated because its actions can result in people losing their most important asset: their home. Thus, Ocwen was required to service mortgage loans in compliance with a number of overlapping servicing standards set forth in a 2011 agreement with the New York State Department of Financial Services ("NYDFS 2011 Agreement") and in the National Mortgage Settlement ("NMS"). These overlapping servicing standards contained numerous requirements governing, among other things, the timing of Ocwen's communications with borrowers. To take but one example, if Ocwen denied a homeowner's request for a reduction in the interest rate of her mortgage loan, Ocwen was required under the NMS to give that borrower written notice that she had thirty days to appeal Ocwen's decision. If no appeal was taken during the thirty-day period, the modification denial would stand, and the borrower could be subject to a possible foreclosure action and loss of her home if she could not continue to make the higher payments. Thus, Ocwen's compliance with these time requirements was crucial; if Ocwen did not afford borrowers the proper amount of time to take certain actions, it could result in improper foreclosures.

8.        Defendants publicly represented that Ocwen was complying with these important servicing standards. On October 31, 2013, Defendant Faris publicly represented Ocwen's "strong compliance" with regulatory requirements. Then, on May 1, 2014, Defendant Erbey

reiterated to investors that Ocwen was in compliance with the National Mortgage Settlement, stating:

> [W]e believe compliance and counterparty strength will be among the most important factors determining long-term success in the servicing business. **We consider our** solid balance sheet, **National Mortgage Settlement compliance** and long history of success in large servicing transfers, where we are able to substantially reduce delinquencies and keep more people in their homes, to be substantial competitive advantages.[1]

9.     However, Ocwen was not complying with these regulatory servicing standards. On October 21, 2014, the NYDFS revealed that during its review of Ocwen's mortgage practices, it had discovered that Ocwen had been "backdating . . . potentially hundreds of thousands of letters to borrowers."   Specifically, Ocwen had been sending borrower communications containing deadlines that predated the mailing of the letters. This improper backdating by Ocwen – in violation of regulatory requirements – could have resulted in the improper denial by Ocwen of mortgage modification requests and other relief to which homeowners were entitled.  This was not an isolated issue at Ocwen.  Indeed, according to a consent order that Ocwen entered into with the NYDFS in December 2014 (the "NYDFS 2014 Consent Order"), Ocwen had been backdating letters to borrowers "for years."

10.     At the heart of the letter backdating issue was Ocwen's proprietary servicing platform, REALServicing, which was created by one of Ocwen's related companies, Altisource Solutions.  According to one of Ocwen's federal regulators, the Consumer Financial Protection Bureau ("CFPB"):  "REALServicing suffers from fundamental system architecture and design flaws, including a lack of properly managed data, lack of automation, and lack of capacity."  In an email quoted in the CFPB's federal complaint against Ocwen, Ocwen's Head of Servicing

---

[1] Unless otherwise noted, emphasis in quotations has been added to the original.

described REALServicing as "*an absolute train wreck*" that caused him to want to "change systems tomorrow" if he could.  Indeed, Ocwen no longer uses REALServicing and has instead switched to a servicing platform run by a non-Ocwen-related entity.

11.     According to documents in the Class Action Proceeding and the Broadway Gate Proceeding publicly filed after the close of discovery in those cases, Ocwen executives, including Erbey and Faris, knew of Ocwen's letter backdating and the issues with REALServicing throughout 2014.  After conducting months of discovery, the class action plaintiffs stated in their pretrial order that "[i]nternal testing of compliance confirmed this fact as did numerous communications between senior Ocwen employees, shared with Ocwen's executives."

12.     Finally, Defendants falsely certified that Ocwen had effective disclosure controls and procedures so that any material information would be promptly discovered and publicly disclosed.  In each of its periodic filings with the SEC during the relevant time period, Ocwen's CEO and CFO personally certified that Ocwen had designed and implemented effective disclosure controls and procedures.  However, these certifications were materially false and misleading in light of the fact that Ocwen failed to disclose to investors that:  (a) Ocwen had been backdating letters to borrowers for years; (b) the letter backdating issue had been raised internally and ignored; (c) Ocwen's mortgage servicing platform was a "train wreck"; and (d) Ocwen did not have a compliance management system in place.

13.     Plaintiffs purchased their Ocwen common stock between February and October 2014 in reliance on Defendants' misrepresentations.  In making the decisions to invest in Ocwen common stock, Plaintiffs' investment adviser read, reviewed, listened to, and relied on Defendants' materially misleading statements.  Plaintiffs, through their investment adviser, also

relied on the integrity of the market price of Ocwen's common stock. Plaintiffs and their investment adviser were unaware of the falsity of Defendants' statements when Plaintiffs purchased Ocwen stock.

14.     Defendants' misrepresentations caused Plaintiffs to purchase Ocwen common stock at artificially-inflated prices. Had it not been for these repeated material misrepresentations, Plaintiffs either would not have purchased their Ocwen shares or would not have paid the prices they paid.

15.     When information about Ocwen's inaccurate financial statements, regulatory noncompliance, and lack of internal controls and disclosure procedures was partially publicly disclosed and processed by the market in August and October 2014, Plaintiffs suffered significant investment losses.

16.     Plaintiffs therefore bring this action to recover the damages suffered as a result of the wrongs committed by Defendants.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78r and 78t(a), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under state common law.

18.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391. Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District.

20.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange and market.

## PARTIES

### A.     Plaintiffs

21.     Plaintiff Owl Creek I, L.P. is a Delaware limited partnership whose investment adviser has its main office location in New York, New York.  A list of the dates on which it purchased Ocwen common stock during the relevant period is attached hereto as Exhibit A.

22.     Plaintiff Owl Creek II, L.P. is a Delaware limited partnership whose investment adviser has its main office location in New York, New York.  A list of the dates on which it purchased Ocwen common stock during the relevant period is attached hereto as Exhibit B.

23.     Plaintiff Owl Creek SRI Master Fund, Ltd., is a Cayman Islands company whose investment adviser has its main office location in New York, New York.  A list of the dates on which it purchased Ocwen common stock during the relevant period is attached hereto as Exhibit C.

24.     Plaintiff Owl Creek Overseas Master Fund, Ltd., is a Cayman Islands company whose investment adviser has its main office location in New York, New York.  A list of the dates on which it purchased Ocwen common stock during the relevant period is attached hereto as Exhibit D.

25.      At all relevant times, Owl Creek Asset Management, L.P. ("Owl Creek") acted as investment adviser to Plaintiffs in connection with their purchases of Ocwen common stock.

B.    **Defendants**

26.    Defendant Ocwen is a Florida corporation with its principal place of business at 1661 Worthington Road, Suite 100, West Palm Beach, FL 33409.  At all relevant times, Ocwen was a publicly-traded company.

27.    Defendant Erbey is the founder and former Chairman of Ocwen.  Upon information and belief, Erbey resides in Saint Croix, U.S. Virgin Islands.

28.    Defendant Faris is the Chief Executive Officer of Ocwen.  Upon information and belief, Faris resides at 11970 Torreyanna Circle, West Palm Beach, FL 33412.

## FACTUAL ALLEGATIONS

I.    **Events Prior to Plaintiffs' Investment in Ocwen**

A.    **The Mortgage Servicing Industry**

29.    Ocwen's primary line of business is residential mortgage loan servicing.  Ocwen is one of the largest mortgage servicers in the United States.  Unlike traditional mortgage loan servicers, Ocwen is not a bank regulated by the Federal Deposit Insurance Corporation or the Office of the Comptroller of the Currency, but rather a financial services company.

30.    Mortgage loan servicers play an important role in the mortgage industry.  The servicers are the entities responsible for (i) collecting and remitting the monthly payments of principal and interest made by the homeowner to repay the mortgage loan, (ii) administering the escrow accounts from which the borrower's property taxes and homeowners insurance are paid, and (iii) managing loans when the borrower has become delinquent in making payments (including negotiating loan modifications with the borrower or instituting foreclosure proceedings against the mortgaged property).  It is the servicer, and not the lender, that the homeowner communicates with about their mortgage loan.

31.     Thus, as a mortgage servicer, Ocwen is required to process and apply homeowner mortgage payments, communicate with homeowners about their loan, insurance, and property tax payments, and create accurate files for each homeowner.  Ocwen is the counterparty who decides whether a struggling homeowner's loan terms can be modified or whether a delinquent borrower's home should be foreclosed upon.

32.     A mortgage servicer's electronic servicing platform is critical to the proper execution of these functions, as well as to the servicer's ability to service loans in accordance with regulatory requirements.   Servicers input loan and borrower information into these electronic servicing platforms.   If the information is inputted incorrectly, or the servicing platform has deficiencies which produce inaccurate information, servicers can make critical errors that lead to harsh results, including the loss of a home.

33.     Mortgage servicers are also the parties responsible for obtaining homeowners insurance when a homeowner has let his insurance coverage lapse.  The insurance procured by the servicer in such circumstances is called "force placed" insurance.

34.     In today's capital markets, mortgage loans are frequently pooled together into securitized trusts in which interests, or "residential mortgage backed securities," are sold to investors.  Companies that service loans owned by such securitized trusts are obligated to make servicing advances to the trusts; that is, the servicer is required to pay the trust for missed payments that the servicer expects the borrower will ultimately pay.  Although servicers are entitled to be reimbursed for any servicing advances they make, the existence of such a requirement requires the servicer to maintain a financing facility.

35.     A mortgage servicer's primary form of remuneration is its mortgage servicing fee, which is a percentage of the unpaid principal balance, or "UPB," of the mortgage loans being

serviced.  Servicers may also earn ancillary fees such as retaining the interest that accrues on loan payments between the time they are paid by the borrower and remitted to the lender or the trust, and in some circumstances collecting late fees from homeowners during a period of delinquency.

36.    The party that owns the right to service a mortgage loan is said to hold the mortgage servicing rights, or "MSRs."  Sometimes, the holder of MSRs will hire a subservicer or a special servicer to service a particular mortgage loan.

### B.    Erbey, Ocwen and the Related Companies

37.    Ocwen was founded in 1988 by Erbey and his business partner, Barry Wish, following the dissolution of Wish's and Erbey's existing venture, The Oxford Financial Group.

38.    During its early years, Wish and Erbey focused Ocwen's growth on the acquisition of nonperforming loans.

39.    Initially, Wish was Ocwen's Chairman and Erbey was its CEO.  However, Erbey replaced Wish as Chairman in 1996.  Erbey served as Ocwen's Chairman and CEO until 2010, when he appointed Faris as CEO.  Faris had served Erbey in various roles at Ocwen since 1991, working his way up the corporate ladder to become Erbey's right-hand man.  Erbey remained as Chairman of Ocwen after he appointed Faris CEO.

40.    In 1999, frustrated with the increasing regulatory scrutiny that Ocwen was receiving from the Office of Thrift Supervision, Erbey commenced a "de-banking" process for Ocwen, turning it from a thrift bank into a financial services company.  The de-banking process was completed in 2004.

41.    Part of Erbey's subsequent plan for Ocwen was to "spin off" certain of Ocwen's business segments into related, but purportedly independent, public companies.  Erbey became

Chairman of all of these new companies while continuing in his position as Chairman of Ocwen. He also received large equity positions in most of the new companies.

42.     In 2009, Erbey spun off Ocwen Solutions into a company called Altisource Portfolio Solutions S.A. ("Altisource Solutions").  Ocwen Solutions had performed a number of services for Ocwen, one of which was developing the technology that Ocwen used to service mortgage loans.  Following the spin-off, Ocwen entered into a long-term licensing agreement to use Altisource Solutions' electronic servicing platform (or "system of record"), REALServicing. Ocwen is Altisource Solutions' largest customer.

43.     Altisource Solutions created an insurance agency subsidiary called Beltline Road Insurance Agency ("Beltline").   In August 2013, Ocwen appointed Beltline as its exclusive insurance representative.

44.     In 2011, Erbey created a new business entity called Home Loan Servicing Solutions, Ltd. ("HLSS").  The purpose of HLSS was to allow Ocwen to pursue an "asset-lite" strategy.  Ocwen sold many of its MSRs to HLSS, meaning that HLSS received the servicing fees and made the servicing advances on those loans, while Ocwen retained the right to subservice those loans and keep the ancillary fees.  Erbey became Chairman of HLSS and received stock in HLSS.

45.     In 2012, Erbey spun off two more public companies:  Altisource Residential Corporation ("Altisource Residential") and Altisource Asset Management Corporation ("Altisource Asset Management").  The purpose of Altisource Residential is to acquire non-performing loans from Ocwen, and then convert foreclosed properties into rental units.  The income from those rental properties is passed through to Altisource Residential's investors.

Erbey became Chairman of Altisource Residential and received a substantial ownership percentage of Altisource Residential.

46.     Altisource Asset Management is the asset manager for Altisource Residential under a fifteen-year asset management agreement between the two entities. As of December 31, 2013, Altisource Asset Management had only seven employees and shared the same executive officers as Altisource Residential. Erbey became Chairman of Altisource Asset Management and received a substantial beneficial ownership percentage of Altisource Asset Management.

47.     Throughout this Complaint, Altisource Solutions, HLSS, Altisource Residential, and Altisource Asset Management will be referred to collectively as the "Related Companies."

### C.     Ocwen's Growth

48.     As is well known, the collapse of the U.S. housing market and the resulting subprime mortgage crisis in 2007 led to a global financial crisis in 2008.

49.     During the global financial crisis, Ocwen took advantage of the resulting increase in mortgage loan delinquencies. Among other things, Ocwen's reduced labor costs, which it achieved by outsourcing customer service positions to India, allowed it to acquire and service large volumes of subprime loans.

50.     In response to the global financial crisis, governments around the globe passed sweeping reforms concerning the regulation and supervision of banks. For example, in July 2010, Congress enacted the Dodd–Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank").

51.     This heightened regulatory environment allowed Ocwen to further benefit from the financial crisis because it was no longer a bank. As a result of the reforms and increased compliance framework, several large banks exited the mortgage servicing business and sold their MSRs to non-banks.

52. Ocwen purchased many of the divesting banks' servicing businesses and MSRs. For example, in 2011, Ocwen acquired Goldman Sach's mortgage servicing arm, Litton Loan Servicing. Similarly, Morgan Stanley exited the mortgage servicing industry in 2012 by selling its servicing unit, Saxon, to Ocwen.

53. Ocwen's largest acquisition during this time period was its 2013 purchase of 1,740,000 loans, with a UPB of $183.1 billion, from Residential Capital, LLC ("ResCap").

54. From 2010 through 2013, Ocwen grew rapidly via portfolio and business acquisitions. In 2010, Ocwen serviced approximately $74 billion UPB of mortgage loans. By 2013, that number had risen to approximately $500 billion.

**D.     Regulatory Servicing Standards**

55. Despite its non-bank status, Ocwen was not completely free from the increased regulatory oversight imposed in the wake of the financial crisis.

56. In 2011, the NYDFS – due to its concern with Ocwen's rapid growth – required Ocwen to enter into an agreement governing Ocwen's servicing practices. The NYDFS 2011 Agreement contained 62 paragraphs of mortgage servicing practices to which Ocwen agreed to adhere. Among other things, Ocwen agreed to end Robo-signing, improve staffing levels and training requirements, provide a dedicated single point of contact for borrowers, ensure that any force-placed insurance was reasonably priced and obtained in an arm's-length transaction, not charge improper fees to borrowers, and undertake certain best practices in pursuing foreclosures.

57. In 2012, the NYDFS discovered that Ocwen had violated that agreement, and therefore required Ocwen to retain a compliance monitor to conduct a comprehensive review of Ocwen's servicing operations over a two-year period (the "NYDFS Compliance Monitor"). The NYDFS Compliance Monitor was required to submit an initial "Compliance Review Report,"

followed by periodic "Progress Reports," and an "Action Plan" for Ocwen to remediate its noncompliance with the NYDFS Agreement.

58.    In February 2012, the CFPB (a new federal agency created under Dodd-Frank), forty-nine states, and the District of Columbia announced a global settlement of federal and state investigations against the country's five-largest mortgage servicers (at that time, Bank of America Corporation, JP Morgan Chase & Co., Wells Fargo & Company, Citigroup Inc., and Ally Financial Inc.) for improper mortgage practices (the "National Mortgage Settlement" or "NMS").  As a subsidiary of Ally Financial, ResCap became subject to the NMS.

59.    Among other things, the National Mortgage Settlement included servicing standards with which servicers were required to comply, many of which overlapped with the servicing standards in the NYDFS 2011 Agreement.  The NMS servicing standards required servicers to:  (a) fix common flaws in foreclosure and bankruptcy procedures (including ensuring that the servicer has the right to foreclose before instituting foreclosure proceedings and verifying that factual assertions made in court documents are accurate); (b) adopt policies and processes to oversee and manage third-party providers retained by the servicer; (c) adopt loss mitigation procedures to reduce foreclosures (including a prohibition on instituting foreclosure proceedings against a borrower with a pending loan modification application); (d) establish a single point of contact for each borrower; (e) implement standard loan modification timelines (including providing the borrower with thirty days to appeal the denial of a loan modification request); (f) implement special procedures to protect active military personnel from foreclosure; (g) not charge unreasonable fees to the borrower; and (h) not unnecessarily impose force-placed insurance on a borrower.

60.     Moreover, servicers subject to the National Mortgage Settlement were required to set up an "Internal Review Group," establish adequate staffing levels, and improve training of mortgage professionals.

61.     Although Ocwen initially was not a party to the National Mortgage Settlement, when it acquired the ResCap loans, it was required to service those loans in accordance with the NMS servicing standards.

62.     In December 2013, Ocwen reached a separate agreement with several governmental authorities to comply with the National Mortgage Settlement.  This agreement required Ocwen to service all loans, not just the ResCap loans, in accordance with the National Mortgage Settlement.

## II.     Defendants' Representations to Induce Plaintiffs to Invest in Ocwen

63.     To induce Plaintiffs to purchase Ocwen's common stock, Defendants made numerous representations about Ocwen's business.  These representations included assurances about the accuracy of Ocwen's financial statements, Ocwen's compliance with regulatory standards, and Ocwen's implementation of effective internal controls and disclosure procedures.

### A.     Representations Concerning Ocwen's Financial Statements and the Effectiveness of Its Internal Controls over Financial Reporting

64.     As a public company, Ocwen is required to report its financial results in accordance with United States Generally Accepted Accounting Principles ("GAAP").  GAAP is a set of accounting standards, the application of which by Ocwen allows Plaintiffs to compare the financial health of Ocwen to other companies.

65.     Ocwen's 2013 annual report, filed with the SEC on Form 10-K on or about February 28, 2014, contained audited financial statements purportedly prepared in accordance with GAAP.  Indeed, Faris certified that "the financial statements, and the other financial

-16-

information included in [Ocwen's 2013 annual report], fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

66.     Ocwen reported that its income before taxes for the year ended December 31, 2013, was $335,223,000.

67.     Ocwen's quarterly report for the first quarter of 2014, filed with the SEC on Form 10-Q on or about May 2, 2014, also contained financial statements purportedly prepared in accordance with GAAP.  Faris again certified the accuracy of the financial information in the quarterly report.

68.     Ocwen reported that its income before taxes for the quarter ended March 31, 2014, was $88,960,000.

69.     As a further safeguard to prevent issuers from reporting materially inaccurate financial information, the SEC requires public companies to implement and design proper internal controls over financial reporting and to report as to the effectiveness of those controls. The existence of effective internal controls over financial reporting at Ocwen was important to Plaintiffs because it provided some assurance that the financial information provided by Ocwen was accurate and prepared in accordance with GAAP.

70.     In Ocwen's 2013 annual report, which was signed by Erbey and Faris, Ocwen reported that its management had conducted an evaluation and concluded that as of December 31, 2013, Ocwen's internal controls over financial reporting were effective.  In his accompanying certification, Faris assured investors that he had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [his] supervision, to provide reasonable assurance regarding the reliability of financial

reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

71.     In its first quarter report for 2014, Ocwen stated that there had been no change in its internal controls over financial reporting during the first quarter "that ha[d] materially affected, or [wa]s reasonably likely to materially affect, our internal control over financial reporting."  Faris's certification to the first quarter report again provided assurances to investors that Ocwen's Chief Executive Officer had designed internal controls to make sure that Ocwen's financial statements were reported in accordance with GAAP and that he had evaluated the effectiveness of those internal controls.

### B.     Representations Concerning Regulatory Compliance

72.     Ocwen's compliance with the NYDFS 2011 Agreement and the National Mortgage Settlement was important to Plaintiffs.  Ocwen's failure to comply with regulatory requirements – and, in particular, the servicing standards imposed by the NYDFS 2011 Agreement and the NMS – could result in the imposition of substantial penalties that would adversely affect Ocwen's business operations and results.

73.     Ocwen's compliance with regulatory requirements was particularly important with respect to the transfer of the ResCap loans – the Company's largest mortgage loan acquisition ever, and the only Ocwen-serviced loans in 2013 that were subject to the NMS – onto the REALServicing electronic servicing platform.

74.     On October 31, 2013, Ocwen, Faris, and Erbey held an investor call to discuss the financial results for the third quarter of 2013.  During that call, Faris discussed the transfer of the ResCap loans onto the REALServicing platform.  Faris informed investors that the integration costs of the ResCap platform had been higher than expected because Ocwen had been "careful to assure excellent customer service and *strong compliance* throughout the transfer process."  The

-18-

import of that statement was clear:  Ocwen was going to extra lengths to ensure that it was complying with the applicable servicing standards as it transferred the ResCap loans onto the REALServicing platform.

75.     In its press release announcing its operating results for the first quarter of 2014, issued on May 1, 2014, Ocwen touted its compliance with the National Mortgage Settlement. Specifically, Erbey stated:

> Going forward, we believe compliance and counterparty strength will be among the most important factors determining long-term success in the servicing business.  **We consider our** solid balance sheet, **National Mortgage Settlement compliance** and long history of success in large servicing transfers, where we are able to substantially reduce delinquencies and keep more people in their homes, to be substantial competitive advantages.

76.     This was a statement of fact that Ocwen was in compliance with the National Mortgage Settlement.

### C.     Representations Concerning Effectiveness of Disclosure Controls and Procedures

77.     Ocwen was required to implement safeguards so that any material developments at the Company would be disclosed to senior management, regulators, and to investors.

78.     Accordingly, Ocwen reported that it had effective disclosure procedures and controls to ensure that material information was publicly disclosed.  For example, in its annual report for 2012, filed with the SEC on Form 10-K on or about March 1, 2013, Ocwen stated that:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act), as of the end of the period covered by this Annual Report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, our disclosure controls and procedures are effective.

79.     Under the Sarbanes-Oxley Act of 2002, Ocwen's CEO and CFO were required to personally certify as to the effectiveness of Ocwen's internal controls relating to disclosure. Thus, for example, Faris signed a certification in connection with Ocwen's 2012 annual report in which he stated that the CFO and he had "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to [Ocwen], including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared" and that the CFO and he had "[e]valuated the effectiveness of [Ocwen's] disclosure controls and procedures and presented in [the accompanying report] our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation."

80.     Faris provided identical certifications in connection with Ocwen's 2013 10-K annual report, 10-Q quarterly reports filed with the SEC for the first, second, and third quarters of 2013, and 10-Q quarterly reports filed with the SEC for the first and second quarters of 2014.

## III.    Plaintiffs Purchase Ocwen Common Stock in Reliance on Defendants' Representations

81.     Plaintiffs are investment funds managed by Owl Creek.

82.     Plaintiffs, through Owl Creek, specifically relied on the representations set forth above prior to purchasing Ocwen stock, as well as on the integrity of the market price of Ocwen common stock.

83.     Owl Creek began building a "long position" – that is, buying stock based on a belief that the stock's price would increase over time – for Plaintiffs in Ocwen in February 2014.

84.     Prior to purchasing Ocwen stock for Plaintiffs, Owl Creek reviewed Ocwen's public disclosures, investor presentations and financial statements.

85.     As Plaintiffs continued to purchase Ocwen stock throughout 2014, Owl Creek kept abreast of publicly-disclosed developments concerning Ocwen by, among other things, reviewing Ocwen's SEC filings.   Owl Creek also had direct communications with Ocwen management.

86.     Ocwen viewed Owl Creek as a significant investor whose purchase of Ocwen stock was necessary to the Company's success and to drive the stock price higher.  Defendants Erbey and Faris had a significant economic interest in inducing Plaintiffs to purchase Ocwen stock.

87.     When purchasing Ocwen stock on behalf of Plaintiffs, Owl Creek actually read (or heard) and relied on each of the statements described above.

88.     Each of the representations made by Defendants was material to Plaintiffs.

89.     The statements concerning the accuracy of Ocwen's reported financial information and preparation of Ocwen's financial statements in accordance with GAAP and the statements about the effectiveness of Ocwen's internal controls over financial reporting were material because they assured Plaintiffs that Ocwen's reported financial statements accurately reflected Ocwen's financial condition.

90.     The statements concerning Ocwen's compliance with regulatory requirements were material because Ocwen's failure to comply with those standards could result in the imposition of significant penalties against Ocwen.

91.     The statements concerning the effectiveness of Ocwen's disclosure controls and procedures were material because such disclosure controls and procedures would ensure that regulatory violations would be publicly disclosed by Ocwen.

92.     Had Owl Creek known the truth (as described below), it would not have purchased Ocwen common stock on behalf of Plaintiffs or, if it had done so, would not have paid the prices it did.

## IV.     Defendants' Representations to Plaintiffs Were Materially False and Misleading

93.     Unbeknownst to Owl Creek and Plaintiffs at the time, the material representations that Defendants made concerning Ocwen's reporting of financial information in accordance with GAAP, Ocwen's compliance with regulatory requirements, and the existence of effective disclosure controls and procedures at Ocwen were either false or omitted truthful information that rendered the representations materially misleading.

### A.     Ocwen Violated GAAP and Misstated the Effectiveness of Its Internal Controls over Financial Reporting

94.     Contrary to its representations to Plaintiffs, Ocwen did not prepare its financial statements in accordance with GAAP and did not have effective internal controls over financial reporting.

95.     On August 12, 2014, Ocwen issued a press release stating that its year-end financial statements for 2013 and its quarterly financial statements for the first quarter of 2014 could no longer be relied upon as being in compliance with GAAP because Ocwen had not been correctly reporting the value of the MSRs sold to HLSS.

96.     Ocwen was required to account for the MSRs it sells to HLSS as a financing, rather than as a sale, because Ocwen retained title to the MSRs.  As such, Ocwen was required to report the future cash flows that HLSS was expected to receive from those MSRs as a liability on Ocwen's balance sheet.  Under GAAP, Ocwen must record the value of the future cash flows at "fair value."  FASB Financial Accounting Standards Codification Topic 820 defines fair value as

"the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."

97.     At the time of each transaction, Ocwen based the fair value of the future cash flows owed to HLSS on the price at which the MSRs were sold to HLSS.  However, each quarter thereafter, Ocwen retained a third-party valuation firm to value those rights.

98.     Rather than report the third party's valuation of the MSRs in its financial statements, Ocwen adopted a valuation methodology that violated GAAP.  If the valuation firm's valuation was within 5% of the carrying value of the MSRs, Ocwen did not adjust the value recorded in its financial statements.  This meant that the third party might be valuing the MSRs at a price that was tens of millions of dollars off from what Ocwen was reporting as "fair value."

99.     Indeed, the valuation of the MSRs provided by the third party fluctuated each quarter, but Ocwen did not change the reported value of the MSRs.

100.    Erbey knew that this valuation method was improper before it was ever implemented.

101.    According to the HLSS Consent Order, Erbey concluded that "'the math would never work' and expressed his concerns to a member of HLSS senior management."  Erbey later commented on the issue:  "when you launch a ship . . . the ship is going to hit the water, [so] don't expect the hull not to get wet."

102.    In its August 12, 2014 press release, Ocwen announced that as a result of the improper accounting method, its pre-tax income for the first quarter of 2014 had been overstated, and its pre-tax income for year ended December 31, 2013, had been understated by approximately $17 million.  The overstatement for the first quarter represented approximately 19% of Ocwen's previously-reported income before taxes for that period.

103.    Ocwen also announced in its August 12, 2014 press release that it "anticipates [that] it will determine that a material weakness existed in the relevant time periods in the adequacy of [its] controls relating to how [it] monitor[s] and implement[s] the impact of applicable accounting conventions."

104.    Ocwen confirmed the overstatement of pre-tax income for the first quarter of 2014 and the understatement of pre-tax income for the year-ended December 31, 2013, when, on August 18, 2014, it restated its financials for 2013 and the first quarter of 2014.  The restated financials showed that the understatement/overstatement of income before taxes was $17,256,000.

105.    In addition, Ocwen admitted in the restated financials that its internal controls over financial reporting for 2013 and the first quarter of 2014 were ineffective.  Specifically, Ocwen admitted that there was a material weakness during those periods in its financial controls because "the use of an accounting convention in its application of the interest method to financing liabilities related to Rights to MSRs sold to HLSS were not properly designed to calculate the appropriate allocation of cash payments between principal and interest in connection with the financing liability."

**B.      Ocwen Failed to Comply with Regulatory Requirements**

106.    Despite its representations to the contrary, Ocwen failed to properly meet its compliance obligations under the 2011 NYDFS Agreement and the National Mortgage Settlement.

107.    For example, Ocwen improperly backdated potentially hundreds of thousands of letters to borrowers.  According to the NYDFS:

> In many cases, borrowers received a letter denying a mortgage loan modification, and the letter . . . was dated more than 30 days prior to the date that Ocwen mailed the letter.  These borrowers

were given 30 days from the date of the denial letter to appeal that denial, but those 30 days had already elapsed by the time they received the backdated letter.  In other cases, Ocwen's systems show that borrowers facing foreclosure received letters with a date by which to cure their default and avoid foreclosure – and the cure date was months prior to receipt of the letter.

. . . .

. . . Ocwen's system shows that Ocwen sent a borrower a pre-foreclosure notice dated May 23, 2013, stating that the borrower was in default and at risk of foreclosure.  Yet, a conflicting record in Ocwen's system indicates that the notice was created on April 9, 2014 – nearly *one year after* the date of the pre-foreclosure notice.  In another example, a letter dated October 29, 2013, warns that the borrower is in danger of foreclosure if he does not make a payment by August 7, 2013, nearly three months prior to the date of the letter.

108.    Although one of Ocwen's employees discovered this backdating issue in 2013 and reported the problem to Ocwen's Vice President of Compliance, Ocwen failed to investigate or disclose the problem.  In April 2014, the same employee raised the issue again.  However, Ocwen again failed to disclose the problem.  On October 21, 2014, the NYDFS notified Ocwen that it had "uncovered serious issues with Ocwen's systems and processes, including Ocwen's backdating of potentially hundreds of thousands of letters to borrowers, likely causing them significant harm."  In December 2014, Ocwen consented to the appointment of an operations monitor by the NYDFS to finally address the problem, which, as Ocwen agreed in the 2014 NYDFS Consent Order, had been going on "for years."

109.    In addition to violating the 2011 NYDFS Agreement, Ocwen's improper backdating of borrower communications also resulted in noncompliance with numerous NMS servicing standards.  NMS servicing standards implicated by the improper backdating included the following:

(a)    If Ocwen received a loan modification request from a borrower, it was required to let the borrower know within 5

business days whether the borrower's application was missing any information or documentation. Ocwen was required to afford the borrower 30 days to submit the missing information or documentation.

(b)     If Ocwen denied a loan modification request, it was required to notify the borrower of the denial within 10 business days. In addition to stating the reasons for the denial and the factual information considered, Ocwen was required to inform the borrower that she had 30 days to appeal the denial of the modification request.

(c)     If a borrower requested a short sale of his property, Ocwen was required to send written confirmation to the borrower that it had received that request within 10 business days. Within 30 days of receiving the borrower's short sale request, Ocwen was required to inform the borrower of any missing required documents. Ocwen was then required to inform the borrower of whether it would permit the short sale within 30 days after receiving all required information and third-party consents.

(d)     Ocwen was not permitted to impose any charge on a borrower for force-placed insurance unless Ocwen first (i) sent a written notice to the borrower concerning the insurance coverage requirements, (ii) sent a second notice at least 30 days after the mailing of the first notice, and (iii) did not receive evidence from the borrower of insurance within 15 days of the second notice.

110.    After news about the letter backdating was released by the NYDFS, the independent compliance monitor for the NMS investigated the issue. Working with Ocwen, the NMS monitor determined that Ocwen had potentially violated 7 of the 33 NMS metrics tested by the monitor.

111.    Ocwen's pervasive letter backdating was due in part to the dire state of its electronic servicing platform.

112.    As explained in the CFPB complaint, REALServicing "lacked the capacity to process the large number of loans that Ocwen . . . acquired and, in part as a result, [REALServicing] ha[d] not been functional for lengthy periods of time."

113.    Members of Ocwen's senior management were well aware of the problems with REALServicing, yet failed to disclose them to the market.   Indeed, according the CFPB complaint, in 2014 Ocwen's Head of Servicing emailed Defendant Faris to complain about REALServicing, describing it as:

> An ***absolute train wreck***.  I know there's no shot in hell, but if I could change systems tomorrow, I would.  I can't tell you the number of hours I and others spend on basic servicing technology blocking and tackling.  I'm not talking about differentiators here. I'm talking about getting the system to stay online, escrow analysis to work, letters to print, etc.  It's ridiculous.

114.    Ultimately, Ocwen's Head of Servicing's prayers were answered, when, in late 2017, Ocwen began to transition from REALServicing to a different electronic servicing platform licensed by an independent third party.

115.    According to documents filed in the Class Action Proceeding and the Broadway Gate Proceeding, Ocwen's executives, including Defendants Erbey and Faris, knew of or recklessly disregarded Ocwen's letter backdating and the issues with REALServicing throughout 2014.  After conducting months of discovery, the class action plaintiffs stated in a publicly filed pretrial order that "[i]nternal testing of compliance confirmed this fact as did numerous communications between senior Ocwen employees, shared with Ocwen's executives."

116.    On the same day that the CFPB filed suit against Ocwen, thirty state mortgage banking and regulatory agencies issued cease-and-desist orders against Ocwen subsidiaries which, in general terms, prevent Ocwen from acquiring MSRs and originating or acquiring new mortgage loans.

117.    The egregiousness of Ocwen's representations of its regulatory compliance is compounded by the fact that, in 2013, Ocwen had no compliance management system in place.

118.   The CFPB requires a regulated entity such as Ocwen to "develop and maintain a sound compliance management system" in order to assure compliance with regulatory requirements.

119.   However, according to documents filed in the Class Action Proceeding and the Broadway Gate Proceeding, Ocwen did not have a compliance management system in place in 2013.

120.   In their pretrial order, the class action plaintiffs stated that "Ocwen had not updated RealServicing's systems and processes to be compliant with NYDFS or NMS servicing requirements, and did not have a compliance management system in place to assure that RealServicing complied with these standards."

121.   In the Broadway Gate Proceeding, the plaintiffs asserted in a publicly filed pretrial stipulation – again after the conclusion of months of discovery – that "Ocwen's compliance management system was for all intents and purposes nonexistent, and its servicing system of record, REALServicing, was compromised and unreliable."

### C.   Ocwen Did Not Have Effective Disclosure Controls and Procedures

122.   Contrary to its public representations, Ocwen's disclosure controls and procedures were nonexistent, let alone effective.

123.   According to the NYDFS October 21, 2014 letter to Ocwen, the backdating issue was flagged for senior management in November 2013.  However, Ocwen failed to do anything "to investigate or remedy the problem" at that time and did not alert "regulators, borrowers, or other interested parties."  The issue was then raised again internally at Ocwen in April 2014, and still the problem was not elevated via the proper channels so that it could be properly disclosed. According to the NYDFS, the problem remained unresolved as of October 2014, even though it had existed for years and had been flagged months earlier.

-28-

124.    Ocwen's lack of a compliance management system further renders its certification of the effectiveness of its disclosure controls and procedures materially misleading.  A compliance management system is required to ensure that a regulated entity such as Ocwen is complying with all applicable rules and regulations.  Without a compliance management system, Ocwen did not have controls in place to ensure that any regulatory issues were being properly addressed and that material information concerning those issues was being disclosed.

## V.    Three Partial Disclosures in August and October 2014 Cause the Price of Ocwen's Stock to Plummet, Resulting in Significant Damages to Plaintiffs

125.    When several partial corrective disclosures concerning the above-described misrepresentations were released to the market, the price of Ocwen common stock significantly declined, and Plaintiffs suffered significant losses on their purchases of Ocwen stock.

126.    The truth about Ocwen's accounting misrepresentations and its lack of effective internal controls with respect to the recording of the sale of MSRs to HLSS was revealed on August 12, 2014, when Ocwen issued a press release stating, among other things, that: (a) its financial statements for 2013 and the first quarter of 2014 could no longer be relied upon; (b) it had been using an improper valuation method in violation of GAAP to value the MSRs sold to HLSS; (c) it had overstated its pre-tax income for the first quarter of 2014 by almost 20%; and (d) its internal controls over financial reporting suffered from a material weakness.  On this news, Ocwen stock dropped 4.5%, from a close of $26.34 per share on August 11, 2014, to close at $25.16 per share on August 12, 2014.

127.    The truth about Ocwen's failure to comply with the 2011 NYDFS Agreement and National Mortgage Settlement, as well as Ocwen's lack of effective disclosure controls and procedures, was partially revealed on October 21, 2014, when the NYDFS issued an open letter to Ocwen recounting the letter-backdating issue.

-29-

128.    In the letter, the NYDFS explained that it had "uncovered serious issues with Ocwen's systems and processes, including Ocwen's **_backdating of potentially hundreds of thousands of letters_** to borrowers, likely causing them significant harm."

129.    Although one of Ocwen's employees discovered the backdating issue in November 2013 and reported the problem to Ocwen's Vice President of Compliance, Ocwen failed to investigate or disclose the problem.  In April 2014, the same employee raised the issue again.  However, Ocwen again failed to disclose the problem.

130.    Throughout this time, Ocwen "did not notify regulators, borrowers, or investigators of this significant issue, nor did Ocwen personnel conduct due diligence to ensure that the issue was firmly resolved . . . or take steps to determine what impact, if any, the backdating may have already had on borrowers."

131.    The NYDFS deemed "Ocwen's indifference to such a serious matter . . . a troubling corporate culture that disregards the needs of struggling borrowers."

132.    Significantly, the NYDFS stated that, as a result of the backdating issue, Ocwen "was not meeting [its] obligations" under various agreements with state and federal authorities. "And given the issues with Ocwen's systems, it may be impossible to determine the scope of Ocwen's non-compliance."

133.    The backdating issue remained unresolved as of the NYDFS's sending of the letter on October 21, 2014 – nearly a year after it was initially discovered.

134.    However, this news did not reveal the full extent of Ocwen's lack of compliance with the 2011 NYDFS Agreement and National Mortgage Settlement.

135.    In response to the NYDFS letter, and before markets closed, Ocwen issued a response admitting the backdating of letters "due to software errors in our correspondence systems," and suggesting that only 283 borrowers in New York received backdated letters.

136.    As a result of the information released on October 21, 2014, Ocwen's stock price fell dramatically by over 18%, to close at $21.48 per share on October 21, 2014, down from a previous close on October 20, 2014, of $26.26 per share.

137.    After the markets closed on October 21, 2014, Ocwen issued another press release, stating that it wished "to correct its statement in a press release earlier . . . that 283 borrowers in New York received letters with incorrect dates" because it was "aware of additional borrowers in New York who received letters with incorrect dates" but did "not yet know how many such letters there were."   The next day, October 22, 2014, the price of Ocwen common stock dropped more than 11%, closing at $19.04 per share.

138.    Overall, the price of Ocwen common stock lost almost 30% of its value on October 21-22, 2014, dropping from $26.26 per share to $19.04 per share.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS

**I.    Misrepresentations Concerning Ocwen's Financial Statements and the Effectiveness of Its Internal Controls over Financial Reporting**

#### A.    Misrepresentations Concerning Ocwen's Income Before Taxes

139.    Ocwen's annual report for 2013, filed with the SEC on Form 10-K on or about February 28, 2014, misrepresented to investors that Ocwen's income before taxes for the year ended December 31, 2013, was $335,223,000.   The 2013 annual report was signed by Defendants Erbey and Faris.

140.    This statement was materially false and misleading because, as set forth in Ocwen's amended annual report for 2013, filed with the SEC on Form 10-K/A on or about

August 18, 2014, Ocwen's income before taxes for the year ended December 31, 2013, was understated by $17,256,000.

141.    Ocwen's quarterly report for the first quarter of 2014, filed with the SEC on Form 10-Q on or about May 2, 2014, misrepresented to investors that Ocwen's income before taxes for the quarter ended March 31, 2014, was $88,960,000.

142.    This statement was materially false and misleading because, as set forth in Ocwen's amended quarterly report for the first quarter of 2014, filed with the SEC on Form 10-Q/A on or about August 18, 2014, Ocwen's income before taxes for the quarter ended March 31, 2014, was overstated by $17,256,000.

**B.    Misrepresentations Concerning Accuracy of Financial Statements**

143.    Defendant Faris misrepresented in his certification, dated February 28, 2014, appended to Ocwen's 2013 annual report that "the financial statements, and the other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

144.    This certification was materially false and misleading because, as set forth in Ocwen's amended annual report for 2013, filed with the SEC on Form 10-K/A on or about August 18, 2014, Ocwen's income before taxes for the year ended December 31, 2013, was understated by $17,256,000.

145.    Defendant Faris misrepresented in his certification, dated May 2, 2014, appended to Ocwen's quarterly report for the first quarter of 2014 that "the financial statements, and the other financial information included in this report, fairly present in all material respects the

financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

146. This certification was materially false and misleading because, as set forth in Ocwen's amended quarterly report for the first quarter of 2014, filed with the SEC on Form 10-Q/A on or about August 18, 2014, Ocwen's income before taxes for the quarter ended March 31, 2014, was overstated by $17,256,000.

C. **Misrepresentations Concerning Effectiveness of Internal Controls over Financial Reporting**

147. In Ocwen's 2013 annual report, filed with the SEC on Form 10-K on or about February 28, 2014, Ocwen misrepresented that "[u]nder the supervision of and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we have conducted an evaluation of our internal control over financial reporting as of December 31, 2013, based on the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control – Integrated Framework (1992). Based on that evaluation, our management concluded that, as of December 31, 2013, internal control over financial reporting is effective based on criteria established in Internal Control – Integrated Framework issued by the COSO." The 2013 annual report was signed by Defendants Erbey and Faris.

148. In his accompanying certification, dated February 28, 2014, Defendant Faris misrepresented that he had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [his] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

149.     These statements were materially false and misleading because, as set forth in Ocwen's amended annual report for 2013, filed with the SEC on Form 10-K/A on or about August 18, 2014, there was "a material weakness in internal control over financial reporting as of December 31, 2013.  The Company's controls related to the use of an accounting convention in its application of the interest method to financing liabilities related to Rights to MSRs sold to HLSS were not properly designed to calculate the appropriate allocation of cash payments between principal and interest in connection with the financing liability."

150.     In Ocwen's quarterly report for the first quarter of 2014, filed with the SEC on Form 10-Q on or about May 2, 2014, Ocwen misrepresented that "[n]o change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act) occurred during the fiscal quarter ended March 31, 2014 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

151.     In his accompanying certification, dated May 2, 2014, Defendant Faris misrepresented that he had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [his] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

152.     These statements were materially false and misleading because, as set forth in Ocwen's amended quarterly report for the first quarter of 2014, filed with the SEC on Form 10-Q/A on or about August 18, 2014, there was:

>     a material weakness in internal control over financial reporting as
>     of December 31, 2013.  The Company's controls related to the use

-34-

of an accounting convention in its application of the interest method to financing liabilities related to Rights to MSRs sold to HLSS were not properly designed to calculate the appropriate allocation of cash payments between principal and interest in connection with the financing liability.

We have corrected our application of the interest method used to calculate the appropriate allocation between principal and interest in connection with accounting for a financing liability related to Rights to MSRs sold to HLSS. We are also in the process of implementing new controls related to the monitoring and oversight of valuations of Level 3 assets and liabilities and the level and timing of critical assumptions used in third-party valuations we use in our accounting processes and reporting. Management believes these initiatives will remediate the material weakness in internal control over financial reporting described above. The Company will test the ongoing operating effectiveness of the new controls in future periods. The material weakness cannot be considered remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively.

## II.    Misrepresentations Concerning Ocwen's Regulatory Compliance

153.    On October 31, 2013, Ocwen, Faris, and Erbey held an investor call to discuss the financial results for the third quarter of 2013.  During that call, Faris discussed the transfer of ResCap loans onto the REALServicing platform.  Faris informed investors that the integration costs of the ResCap platform had been higher than expected because Ocwen had been "careful to assure excellent customer service and ***strong compliance*** throughout the transfer process."  Faris thus represented to the market that, not only was Ocwen complying with its regulatory obligations, but also that Ocwen's compliance was "strong."

154.    In its press release announcing its operating results for the first quarter of 2014, attached as an exhibit to a Form 8-K filed with the SEC on May 1, 2014, Ocwen misrepresented, in a quote attributed to Defendant Erbey, that:

Going forward, we believe compliance and counterparty strength will be among the most important factors determining long-term success in the servicing business. ***We consider our*** solid balance

-35-

sheet, ***National Mortgage Settlement compliance*** and long history of success in large servicing transfers, where we are able to substantially reduce delinquencies and keep more people in their homes, to be substantial competitive advantages.

This was a statement of fact that Ocwen was in compliance with the National Mortgage Settlement

155.    These statements were materially false and misleading.  Ocwen's improper backdating of letters to borrowers violated numerous servicing standards under the 2011 NYDFS Agreement and the National Mortgage Settlement.  As Ocwen subsequently agreed to in the 2014 NYDFS Consent Order, Ocwen had been improperly backdating letters "for years" prior to December 2014.

156.    The dire state of Ocwen's electronic servicing platform also contributed to Ocwen's regulatory noncompliance.  REALServicing "lacked the capacity to process the large number of loans that Ocwen . . . acquired and, in part as a result, [REALServicing] ha[d] not been functional for lengthy periods of time."  The problems with REALServicing meant that Ocwen was not properly servicing mortgage loans in accordance with regulatory requirements.

157.    Lastly, Ocwen did not have a compliance management system in 2013, and therefore, no system in place to ensure its compliance with the servicing requirements imposed by regulators.

**III.    Misrepresentations Concerning the Effectiveness of Ocwen's Disclosure Controls and Procedures**

158.    Ocwen reported that it had effective disclosure controls and procedures to ensure that material information was publicly disclosed.

159.    In its annual report for 2012, filed with the SEC on Form 10-K on or about March 1, 2013, Ocwen stated that:

Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act), as of the end of the period covered by this Annual Report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, our disclosure controls and procedures are effective.

160.    In its quarterly report for the first quarter of 2013, filed with the SEC on Form

10-Q on or about May 7, 2013, Ocwen stated that:

Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of March 31, 2013. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2013, our disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

161.    In its quarterly report for the second quarter of 2013, filed with the SEC on Form

10-Q on or about August 5, 2013, Ocwen stated that:

Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of June 30, 2013. Based on this evaluation, our Chief Executive Officer and Chief Financial

Officer concluded that, as of June 30, 2013, our disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

162.    In its quarterly report for the third quarter of 2013, filed with the SEC on Form

10-Q on or about November 4, 2013, Ocwen stated that:

Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of September 30, 2013. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of September 30, 2013, our disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

163.    In its annual report for 2013, filed with the SEC on Form 10-K on or about

February 28, 2014, Ocwen stated that:

Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial

Officer, has evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act), as of the end of the period covered by this Annual Report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, our disclosure controls and procedures are effective.

164.    In its quarterly report for the first quarter of 2014, filed with the SEC on Form

10-Q on or about May 2, 2014, Ocwen stated that:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of March 31, 2014. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2014, our disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

165.    Defendant Faris signed a certification in connection with Ocwen's 2012 annual

report in which he stated that he had "[d]esigned such disclosure controls and procedures, or

caused such disclosure controls and procedures to be designed under [his] supervision, to ensure

that material information relating to [Ocwen], including its consolidated subsidiaries, is made

known to [him] by others within those entities, particularly during the period in which this report

is being prepared" and that he had "[e]valuated the effectiveness of [Ocwen's] disclosure

controls and procedures and presented in [the accompanying report] [his] conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation."

166.    Faris provided identical certifications with Ocwen's quarterly reports for the first, second, and third quarters of 2013.

167.    Faris signed a certification in connection with Ocwen's 2013 annual report in which he stated that he had "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under [his] supervision, to ensure that material information relating to [Ocwen], including its consolidated subsidiaries, is made known to [him] by others within those entities, particularly during the period in which this report is being prepared" and that he had "[e]valuated the effectiveness of [Ocwen's] disclosure controls and procedures and presented in [the accompanying report] [his] conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation."

168.    Faris provided identical certifications with Ocwen's quarterly reports for the first and second quarters of 2014.

169.    The statements set forth above in paragraphs 159 through 168 were materially false and misleading for a number of reasons.

170.    First, the letter backdating issue is indicative of serious internal control failings at Ocwen.  According to the NYDFS October 21, 2014 letter to Ocwen, the backdating issue was flagged for senior management in November 2013.  However, Ocwen failed to do anything "to investigate or remedy the problem" at that time and did not alert "regulators, borrowers, or other interested parties."  The issue was then raised again internally at Ocwen in April 2014, and still

the problem was not elevated via the proper channels so that it could be properly disclosed. According to the NYDFS, the problem remained unresolved as of October 2014, even though it had existed for years and had been flagged months earlier.

171.     Ocwen also did not have a compliance management system.   Without a compliance management system, Ocwen did not have controls in place to make sure that any regulatory issues were being properly addressed and that material information concerning those issues was being disclosed.

## SUMMARY OF DEFENDANTS' SCIENTER

172.     Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

173.     Defendants Erbey and Faris acted with scienter with respect to the materially false and misleading statements discussed above.

174.     With respect to misrepresentations in Ocwen's financial statements, as detailed in the HLSS Consent Order, Defendant Erbey knew that the valuation methodology Ocwen used to account for the sale of MSRs to HLSS was improper, and in fact expressly questioned its use.

175.     Moreover, Defendant Faris certified that, as CEO of Ocwen, he personally conducted an evaluation of the effectiveness of Ocwen's internal controls over financial reporting.   He therefore was aware of or recklessly disregarded the improper valuation methodology being employed by Ocwen and the resulting failure in the effectiveness of Ocwen's internal controls over financial reporting.

176.     As senior executives of Ocwen, Erbey's and Faris's knowledge is imputable to Defendant Ocwen.

177.    With respect to the misrepresentations concerning Ocwen's regulatory compliance, Defendants Erbey and Faris knew of or recklessly disregarded Ocwen's letter backdating and the issues with REALServicing throughout 2014.  Indeed, according to the class action plaintiffs in their pretrial order, "[i]nternal testing of compliance confirmed this fact as did numerous communications between senior Ocwen employees, shared with Ocwen's executives."

178.    Defendant Faris also knew that Ocwen was not in compliance with regulatory requirements because he sat on Ocwen's Compliance Committee, which was responsible for ensuring Ocwen's compliance with all applicable laws and regulations.

179.    Faris was also aware of the significant problems with REALServicing, which contributed to Ocwen's improper backdating of letters.   Indeed, according to the CFPB complaint, Ocwen's Head of Servicing wrote in an email to Faris that REALServicing was an "*absolute train wreck*" and that if he "could change systems tomorrow, [he] would."

180.    As senior executives of Ocwen, Erbey's and Faris's knowledge is imputable to Defendant Ocwen.

181.    Finally, with respect to the misrepresentations of Ocwen's disclosure controls and procedures, Defendants Erbey and Faris knew or recklessly disregarded that Ocwen had been improperly backdating letters "for years" prior to December 2014 and that Ocwen did not have a compliance management system in place in 2013.

182.    Faris also certified that he had conducted an evaluation of the effectiveness of Ocwen's disclosure controls and procedures.  He therefore knew that Ocwen lacked effective disclosure controls and procedures.

183.    As senior executives of Ocwen, Erbey's and Faris's knowledge is imputable to Defendant Ocwen.

## SUMMARY OF DEFENDANTS' NEGLIGENCE

184.   Defendants Erbey and Faris were at least negligent in making the misstatements set forth above.

185.   Had Erbey acted with the standard of care required of a Chairman of a public company, he would have been aware that Ocwen was improperly valuing the sale of MSRs to HLSS and did not have effective internal controls over financial reporting, he would have been aware that Ocwen was not in compliance with regulatory requirements, and he would have been aware that Ocwen did not have effective disclosure controls and procedures.

186.   Had Faris acted with the standard of care required of a CEO of a public company, he would have been aware that Ocwen was improperly valuing the sale of MSRs to HLSS and did not have effective internal controls over financial reporting, he would have been aware that Ocwen was not in compliance with regulatory requirements, and he would have been aware that Ocwen did not have effective disclosure controls and procedures.

## PLAINTIFFS' ACTUAL RELIANCE

187.   Plaintiffs, through Owl Creek, actually, read (or heard), reviewed, and relied upon Defendants' misrepresentations prior to purchasing Ocwen stock.

188.   Owl Creek began purchasing Ocwen common stock for Plaintiffs in February 2014.

189.   Prior to purchasing Ocwen stock for Plaintiffs, one or more employees of Owl Creek actually read (or heard), reviewed, and relied upon Ocwen's public disclosures, investor presentations, and financial statements, including the October 31, 2013 conference call, the 2012 annual report and the certifications thereto, and the quarterly reports for the first, second, and third quarters of 2013 and the certifications thereto.

190.    As Plaintiffs continued to purchase Ocwen stock throughout 2014, Owl Creek kept abreast of publicly-disclosed developments concerning Ocwen, and prior to purchasing stock, as applicable, actually read (or heard), reviewed, and relied upon Ocwen's public disclosures, investor presentations and financial statements, including the May 1, 2014 press release, the 2013 annual report and the certifications thereto, and the quarterly reports for the first and second quarters of 2014 and the certifications thereto.

191.    When purchasing Ocwen stock on behalf of Plaintiffs, Owl Creek actually read (or heard) and relied on each of the statements described above.

192.    Had Owl Creek known the truth, it would not have purchased Ocwen common stock on behalf of Plaintiffs or, if it had done so, would not have paid the prices it did.

## PRESUMPTION OF RELIANCE

193.    In addition to Plaintiffs' actual reliance, Plaintiffs intend in the alternative to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:  (a) Defendants made public misrepresentations or failed to disclose material facts during the relevant time period; (b) the omissions and misrepresentations were material; (c) Ocwen common stock traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Ocwen common stock; and (e) Plaintiffs purchased Ocwen common stock between the time Defendants misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

194.    The market for Ocwen common stock was open, well-developed, and efficient at all relevant times.  As a result of the aforementioned materially false and misleading statements

and failures to disclose, Ocwen common stock traded at artificially inflated prices during the relevant period.

195.    At all relevant times, the market for Ocwen common stock was efficient for the following reasons, among others:  (a) Ocwen filed periodic reports with the SEC; (b) the stock was listed and actively traded on the NYSE; (c) numerous analysts, including analysts from BofA Merrill Lynch, Citigroup, and Barclays, followed Ocwen; and (d) Ocwen regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

196.    Plaintiffs purchased Ocwen common stock in reliance on the market price of Ocwen common stock, which reflected all the information in the market, including the misstatements by Defendants.

## LOSS CAUSATION

197.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.  During the time that Plaintiffs purchased Ocwen common stock, as set forth in Exhibits A through D, the market price of those securities was artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.  As a series of corrective but inadequate disclosures was issued, as detailed above in paragraphs 125 through 138, the price of those securities dropped, and Plaintiffs were damaged.

198.    As a public company, Defendants were required to, and sought to assure investors that, Ocwen's financial results were reported in accordance with GAAP.  In doing so,

Defendants concealed the foreseeable risk that Ocwen's financial statements did not accurately reflect its financial results. That risk materialized on August 12, 2014, when Ocwen issued a press release stating that its year-end financial statements for 2013 and its quarterly financial statements for the first quarter of 2014 could no longer be relied upon as being in compliance with GAAP because it had not been correctly reporting the value of the MSRs sold to HLSS, causing Ocwen's stock price to decline as detailed above.

199. As highlighted by the October 31, 2013 and May 1, 2014 misstatements, Defendants sought to assure investors that Ocwen was in compliance with its regulatory obligations. In doing so, Defendants concealed the foreseeable risk that Ocwen's regulatory noncompliance would lead to increased scrutiny from, and potential penalties imposed by, its regulators. That risk partially materialized when, on October 21-22, 2014, the NYDFS issued a letter and Ocwen issued two press releases revealing that Ocwen had been improperly backdating letters to borrowers, which caused the price of Ocwen stock to decline as detailed above.

200. Finally, Defendants sought to assure investors that Ocwen had effective disclosure controls and procedures. In doing so, they concealed the foreseeable risk that Ocwen's lack of disclosure controls and procedures would lead to increased scrutiny from, and potential penalties imposed by, its regulators. That risk partially materialized when, on October 21-22, 2014, the NYDFS issued a letter and Ocwen issued two press releases revealing that Ocwen had been improperly backdating letters to borrowers, which caused the price of Ocwen stock to decline as detailed above.

## NO SAFE HARBOR

201. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made.  Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected."  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Ocwen who knew that those statements were false when made.

## FIRST CAUSE OF ACTION

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

202.    Plaintiffs repeat and reallege paragraphs 21-183 and 187-201 as if set forth herein.

203.    This Cause of Action is asserted against Defendants Ocwen, Erbey, and Faris for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

204.    Defendants Ocwen, Erbey, and Faris, both directly and indirectly, used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements and omissions of material fact alleged herein to:  (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of Ocwen common stock; and (iii) cause Plaintiffs to purchase Ocwen common stock at

-47-

artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Ocwen, Erbey, and Faris took the actions set forth above.

205.    Defendants Ocwen, Erbey, and Faris both directly and indirectly:  (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Ocwen common stock in an effort to artificially inflate and maintain the market prices for Ocwen common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

206.    By virtue of their high-level positions at the Company, Defendants Erbey and Faris were authorized to make public statements, and made public statements on Ocwen's behalf. These senior executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

207.    In addition, Defendants Ocwen, Erbey, and Faris had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading so that the market price of the Company's securities would be based on truthful, complete and accurate information.

208.    Defendants Ocwen, Erbey, and Faris acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them. Ocwen's, Erbey's, and Faris's material misrepresentations and omissions were done knowingly

and/or recklessly, and had the effect of concealing the truth with respect to Ocwen's operations, business, performance, and prospects from the investing public, including misstating the accuracy of Ocwen's financial statements, Ocwen's compliance with regulatory requirements, and the effectiveness of Ocwen's internal and disclosure controls and procedures.  By concealing these material facts from investors, Ocwen, Erbey and Faris supported the artificially inflated price of Ocwen's securities.

209.     The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Ocwen's securities.  In ignorance of the fact that the market prices were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Ocwen, and upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was recklessly disregarded by Defendants Ocwen, Erbey, and Faris, but not disclosed in public statements by Ocwen, Erbey, and Faris, Plaintiffs purchased Ocwen common stock at artificially inflated prices.  As a series of partial but inadequate disclosures were issued, the price of Ocwen's securities substantially declined.

210.     At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true.  Had Plaintiffs known the truth with respect to the business, operations, performance and prospects of Ocwen, which was concealed by Defendants Ocwen, Erbey, and Faris, Plaintiffs would not have purchased Ocwen common stock, or if they had purchased such securities, they would not have done so at the artificially inflated prices that they paid.

211.     By virtue of the foregoing, Defendants Ocwen, Erbey, and Faris have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

212.     As a direct and proximate result of Defendants Ocwen's, Erbey's, and Faris's, wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in the Company's securities.

213.     Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants Ocwen, Erbey, and Faris in the matter *In re Ocwen Financial Corp. Securities Litigation*, Case No. 14-cv-81057-WPD (S.D. Fla.), as well as a tolling agreement between Plaintiffs and Defendants, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## SECOND CAUSE OF ACTION

### Violations of Section 18 of the Exchange Act
### Against All Defendants

214.     Plaintiffs repeat and reallege paragraphs 21-71, 77-105, 122-152, 158-171, 184-192, and 197-201 as if set forth herein.

215.     As alleged herein, Defendants Ocwen, Erbey, and Faris negligently caused statements to be made in the Company's 2012 and 2013 annual reports (filed with the SEC pursuant to the rules or regulations of the Exchange Act), and Defendants Ocwen and Faris negligently caused statements to be made in the Company's quarterly reports for the first, second and third quarters of 2013 and first and second quarters of 2014 (filed with the SEC pursuant to the rules or regulations of the Exchange Act), which statements were, at the time and in light of the circumstances under which made, false or misleading with respect to material facts.

216.     In purchasing Ocwen stock, Plaintiffs' investment team actually read, and had direct eyeball reliance on, the statements in the 2012 and 2013 annual reports and on the

statements in the first, second, and third quarterly reports for 2013 and first and second quarterly

reports for 2014.

217.    Specifically, one or more employees of Owl Creek actually read and relied upon

the following statements:

- Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act), as of the end of the period covered by this Annual Report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, our disclosure controls and procedures are effective. – 2012 annual report.

- Under the supervision of and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we have conducted an evaluation of our internal control over financial reporting as of December 31, 2012, based on the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control—Integrated Framework. Based on that evaluation, our management concluded that, as of December 31, 2012, internal control over financial reporting is effective based on criteria established in Internal Control—Integrated Framework issued by the COSO. – 2012 annual report.

- Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of March 31, 2013. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2013, our disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed,

summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure. – 2013 first quarter report.

- No change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act) occurred during the fiscal quarter ended March 31, 2013 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. – 2013 first quarter report.

- Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of June 30, 2013. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of June 30, 2013, our disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure. – 2013 second quarter report.

- No change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act) occurred during the fiscal quarter ended June 30, 2013 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. – 2013 second quarter report.

- Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of September 30, 2013. Based on this

-52-

evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of September 30, 2013, our disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure. – 2013 third quarter report.

- No change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act) occurred during the fiscal quarter ended September 30, 2013 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. – 2013 third quarter report.

- Reported income before taxes for the year ended December 31, 2013 was $335,223,000. – 2013 annual report.

- [T]he financial statements, and the other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report. – 2013 annual report.

- Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act), as of the end of the period covered by this Annual Report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, our disclosure controls and procedures are effective. – 2013 annual report.

- Under the supervision of and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we have conducted an evaluation of our internal

control over financial reporting as of December 31, 2013, based on the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control—Integrated Framework (1992). Based on that evaluation, our management concluded that, as of December 31, 2013, internal control over financial reporting is effective based on criteria established in Internal Control—Integrated Framework issued by the COSO. – 2013 annual report.

- Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of March 31, 2014. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2014, our disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure. – 2014 first quarter report.

- Ocwen's CEO and CFO had "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under their supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to them by others within those entities, particularly during the period in which this report is being prepared" and had "[e]valuated the effectiveness of [Ocwen's] disclosure controls and procedures and presented in [the accompanying report] our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation." – Faris certifications to 2012 annual report, 2013 first quarter report, 2013 second quarter report, 2013 third quarter report, 2013 annual report, 2014 first quarter report, and 2014 second quarter report.

218.    In ignorance of the falsity of Defendants' statements or of the true facts, Plaintiffs purchased Ocwen's securities in actual, eyeball reliance upon Defendants' representations.

219.    Defendants' materially false or misleading statements artificially inflated the price of Ocwen securities.

220.    Had they known the true facts, Plaintiffs would not have purchased the Ocwen securities and/or would not have purchased them at the inflated prices they paid.

221.    Upon the disclosure of the true facts and/or the materialization of the concealed risks, the price of Ocwen common stock dropped, and Plaintiffs suffered damages in an amount to be proven at trial.

222.    By reason of the foregoing, Defendants Ocwen, Erbey, and Faris are liable to Plaintiffs for violations of Section 18 of the Exchange Act, 15 U.S.C. §78r.

223.    Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants Ocwen, Erbey, and Faris in the matter *In re Ocwen Financial Corp. Securities Litigation*, Case No. 14-cv-81057-WPD (S.D. Fla.), as well as a tolling agreement between Plaintiffs and Defendants, Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within three years of the accrual of this cause of action.

## THIRD CAUSE OF ACTION

### Violations of Section 20(a) of the Exchange Act
### Against the Defendants Erbey and Faris

224.    Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth herein.

225.    This Cause of Action is asserted against Defendants Erbey and Faris and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

226.    Each of Defendants Erbey and Faris was at the time of the wrongs alleged herein a controlling person of Ocwen within the meaning of Section 20(a) of the Exchange Act.

227.    By virtue of their high level positions, and their ownership and contractual rights, substantial participation in, and/or awareness of, the Company's operations and/or knowledge of the materially false and misleading statements filed with the SEC and disseminated to the investing public, Defendants Erbey and Faris had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of the Company.

228.    Defendants Erbey and Faris were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  In particular, Defendants Erbey and Faris each had direct and supervisory involvement in the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular false and misleading statements and omissions giving rise to the securities violations alleged herein.

229.    By reason of the conduct alleged in the First Cause of Action, Ocwen is liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Defendants Erbey and Faris are liable pursuant to Section 20(a) based on their control of Ocwen.

230.    By reason of the conduct alleged in the Second Cause of Action, Ocwen is liable for violations of Section 18 of the Exchange Act, and Defendants Erbey and Faris are liable pursuant to Section 20(a) based on their control of Ocwen.

231.   Defendants Erbey and Faris are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs for the substantial damages suffered in connection with their purchases of Ocwen common stock.

232.   Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants Ocwen, Erbey, and Faris in the matter *In re Ocwen Financial Corp. Securities Litigation*, Case No. 14-cv-81057-WPD (S.D. Fla.), as well as a tolling agreement between Plaintiffs and Defendants, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## FOURTH CAUSE OF ACTION

### Fraud
### Against All Defendants

233.   Plaintiffs repeat and reallege paragraphs 21-183, 187-192, and 197-200, as if set forth herein.

234.   Defendants Ocwen, Erbey, and Faris made, authorized or caused the representations and/or omissions set forth above.

235.   Those representations and omissions were material.

236.   The material representations set forth above were knowingly made by such Defendants with the intent to deceive, and such Defendants' representations omitted and concealed material statements of fact from Plaintiffs.

237.   Each such Defendant knew its representations were false and/or misleading, and their omissions were material and rendered their representations misleading at the time they were made or omitted.

238.     Defendants knew that Plaintiffs would receive and rely on such representations, and intended that their false and/or misleading statements would induce Plaintiffs to purchase Ocwen common stock at inflated prices.

239.     Plaintiffs reasonably and justifiably relied on such misrepresentations and omissions.  Plaintiffs would not have purchased Ocwen common stock at all, or at the prices they paid, had they known the true facts regarding, *inter alia*, Ocwen's failure to report its financial results in accordance with GAAP, Ocwen's violation of regulatory requirements, and Ocwen's lack of effective internal and disclosure controls and procedures.

240.     As a direct and proximate result of such reliance, and Defendants' fraudulent misconduct, Plaintiffs have suffered damages.

## FIFTH CAUSE OF ACTION

### Negligent Misrepresentation
### Against All Defendants

241.     Plaintiffs repeat and reallege paragraphs 21-171, 184-192, and 197-200 as if set forth herein.

242.     Defendants Ocwen, Erbey, and Faris authorized or caused the representations and/or omissions set forth above.

243.     Defendants Ocwen, Erbey, and Faris supplied false information for use by Plaintiffs in making an investment decision.

244.     Defendants Ocwen, Erbey, and Faris were aware that Plaintiffs were a large investor and actively sought to induce Plaintiffs to purchase Ocwen common stock.  Plaintiffs' purchases of large amounts of stock helped keep Ocwen's stock price high because of increased demand.  Defendants Erbey and Faris collectively held millions of shares and options to acquire Ocwen common stock at the time Plaintiffs purchased Ocwen common stock.  Thus, Defendants

Erbey and Faris directly benefitted from Plaintiffs' purchases of Ocwen stock, and had a pecuniary interest in those transactions.  As a result of their pecuniary interest in the transactions, Defendants Erbey and Faris had a duty to exercise reasonable care and competence in providing information about Ocwen to Plaintiffs.

245.    Defendants Erbey and Faris made misrepresentations that they knew, or should have known, to be false in order to induce Plaintiffs to purchase Ocwen common stock.

246.    Defendants Erbey and Faris breached their duty to exercise reasonable care in making these misrepresentations to Plaintiffs.

247.    Plaintiffs reasonably relied on the information Defendants Ocwen, Erbey, and Faris provided and were damaged as a result of these misrepresentations.  Plaintiffs would not have purchased Ocwen common stock at all, or at the prices they paid, had they known the true facts regarding, *inter alia*, Ocwen's failure to report its financial results in accordance with GAAP, Ocwen's violation of regulatory requirements, and Ocwen's lack of effective internal and disclosure controls and procedures.

248.    By reason of the foregoing, Defendants are liable to Plaintiffs for negligent misrepresentation.

249.    As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs have suffered damages.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request relief and judgment, as follows:

(a)    Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b) Awarding Plaintiffs punitive damages;

(c) Awarding Plaintiffs their attorneys' fees and costs; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: April 17, 2018                    Respectfully submitted,


_____/s/ Robert F. Elgidely_____
Robert F. Elgidely
Florida Bar No. 111856
relgidely@gjb-law.com

GENOVESE JOBLOVE & BATTISTA

200 East Broward Boulevard, Suite 1110
Fort Lauderdale, FL 33301
Tel.  954.453.8022

and

*Of Counsel*

LOWENSTEIN SANDLER LLP

Lawrence M. Rolnick, NY Bar No. 2024784
lrolnick@lowenstein.com
Marc B. Kramer, NY Bar No. 2167146
mkramer@lowenstein.com
Michael J. Hampson, NY Bar No. 4699120
mhampson@lowenstein.com
1251 Avenue of the Americas
New York, NY  10020
Tel. 212.262.6700

Thomas E. Redburn, Jr., NJ Bar No. 033661995
tredburn@lowenstein.com
One Lowenstein Drive
Roseland, NJ 07068
Tel. 973.597.2500


*Attorneys for Plaintiffs*