UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.  18-80506-CIV-BLOOM/REINHART

OWL CREEK I, L.P., et al.,

                    Plaintiffs,

vs.


OCWEN FINANCIAL CORP., et al.,

                    Defendants.

_____/


## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS (DE 43)

Currently before the Court is Defendants' Motion to Dismiss certain factual allegations from the Complaint based on Rule 12(b)(6) and the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (PSLRA).  DE 43.  This motion was referred to the undersigned for final disposition by the presiding District Judge, following the parties' consent to have the undersigned Magistrate Judge decide the instant motion.  DE 61, 64, 65.  The undersigned has reviewed the Complaint (DE 1), the Motion to Dismiss (DE 43), Plaintiffs' response to the motion (DE 46), and Defendants' reply.  DE 47.  The Court heard oral argument of the motion on August 29, 2018 (DE 62), and this matter is now ripe for decision.

For the reasons that follow, Defendants' Motion to Dismiss certain allegations from the Complaint (DE 43) is **GRANTED IN PART AND DENIED IN PART.**

## ALLEGATIONS IN THE COMPLAINT

The following constitute the material facts alleged in the Complaint.[1]   All paragraph citations (noted as "¶" or "¶¶") are references to the numbered paragraphs in the Complaint:

Plaintiffs are investment funds that purchased the common stock of Defendant Ocwen Financial Corporation (Ocwen) beginning in February 2014 and throughout that year.  ¶¶1, 3, 188, 190.  Ocwen is a mortgage servicing company founded by Defendant Erbey.  ¶2.  He ran the company until he was "forced to resign," at which time his "right-hand man" and "long time compatriot," Defendant Faris, took over.  *Id.*[2]  According to the Complaint, Defendants sought to induce Plaintiffs to invest "tens of millions of dollars" in Ocwen by "making false and materially misleading statements concerning the accuracy of Ocwen's financial statements, its purported regulatory compliance, and the effectiveness of its internal controls and disclosure procedures." ¶¶4, 5.

As a mortgage servicer, Ocwen was "required to service mortgage loans in compliance with a number of overlapping servicing standards set forth in a 2011 agreement with the New York State Department of Financial Services (NYDFS 2011 Agreement) and in the National Mortgage Settlement (NMS)."  ¶7.[3]  These servicing standards govern, among other things, the timing of Ocwen's communications with borrowers.  *Id.*  Particularly relevant here is NMS's

---

[1] For purposes of this Motion, the Court accepts all well-pled factual allegations in the Complaint, and the attached exhibits, as true and evaluates all plausible inferences derived from those facts in favor of the Plaintiffs. *See Chaparro v. Carnival Corp.,* 693 F.3d 1333, 1337 (11th Cir. 20112); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC,* 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009) ("On a motion to dismiss, the complaint is construed in the light most favorable to the non-moving party, and all facts alleged by the non-moving party are accepted as true.").

[2] After Faris became CEO, Erbey remained on the executive board, with the title "Former Executive Chairman."  DE 43-4 at 3.

[3] NMS was a 2012 global settlement, resulting from federal and state investigations of large mortgage servicers for improper practices.  ¶58.

requirement that any denial of a homeowner's request for an interest rate reduction be accompanied by written notice of the thirty-day appeal period.  This notice was significant because failure to timely appeal a denial could result in a foreclosure action.  *Id.*  On October 21, 2014, the NYDFS revealed in an open letter that Ocwen had been "backdating . . . potentially hundreds of thousands of letters to borrowers," thus, belatedly advising its borrowers of deadlines that had already passed.  ¶¶9, 127.  Ocwen subsequently acknowledged in a consent order with the NYDFS that it had been backdating letters to borrowers "for years."  ¶¶9, 181.  This backdating issue also revealed a problem in Ocwen's disclosure controls because an employee had discovered the problem in November 2013 and reported it to Ocwen's Vice President of Compliance, but Ocwen "failed to investigate or disclose the problem." ¶¶108, 123, 129.  The same employee raised the backdating issue again in April 2014, but it was still not publicly disclosed by the company. *Id.*

Notwithstanding this history, on October 31, 2013, Defendant Faris, who was then serving as Ocwen's CEO, President and Director, and also sat on Ocwen's Compliance Committee, advised investors during a conference call that Ocwen had been "careful to assure . . . strong compliance" while it transferred nearly two million newly-acquired loans from Residential Capital, LLC (ResCap) to Ocwen's electronic loan servicing platform, REALServicing. ¶¶8, 53, 74, 153, 178; DE 43-4 at 3.  Faris told investors that the transfer of the ResCap loans had been costlier than expected because of the company's emphasis on compliance.  ¶74.[4]

---

[4] Although Ocwen initially was not a party to the National Mortgage Settlement, when it acquired the ResCap loans, it was required to service those loans in accordance with the NMS standards. ¶61. Thereafter, in December 2013, Ocwen reached a separate agreement with several governmental authorities to comply with the NMS. This agreement required Ocwen to service all of its loans, not just the ResCap loans, in accordance with the NMS.  ¶62.

Plaintiffs considered Ocwen's compliance with the NYDFS 2011 Agreement and the NMS to be important because Ocwen's failure to comply with their regulatory requirements could result in the imposition of substantial penalties that would adversely affect Ocwen's business operations and results.  ¶72, 90.  According to the Complaint, "[h]ad Faris acted with the standard of care required of a CEO of a public company . . . he would have been aware that Ocwen was not in compliance with regulatory requirements."  ¶186.

Exactly six months after Faris' statement to investors, Erbey announced Ocwen's operating results for the first quarter of 2014 in a press release dated May 1, 2014.  The press release "touted [Ocwen's] compliance with the [NMS]."  ¶75.  Specifically, Erbey stated:

> Going forward, we believe compliance and counterparty strength will be among the most important factors determining long-term success in the servicing business. *We consider our* solid balance sheet, *National Mortgage Settlement compliance* and long history of success in large servicing transfers, where we are able to substantially reduce delinquencies and keep more people in their homes, to be substantial competitive advantages.

¶¶75, 154 (emphasis in Complaint).  Plaintiffs interpreted this as "statement of fact that Ocwen was in compliance with the [NMS]" (¶¶76, 154), and claim that "[h]ad Erbey acted with the standard of care required of a Chairman of a public company . . . he would have been aware that Ocwen was not in compliance with regulatory requirements . . ." ¶185.  According to the Complaint, "Defendants Erbey and Faris knew of or recklessly disregarded Ocwen's letter backdating and the issues with REALServicing throughout 2014." ¶¶115, 177, 181.[5]

When several partial corrective disclosures concerning the above-described misrepresentations were released to the market, the price of Ocwen common stock dropped precipitously, and Plaintiffs suffered significant losses on their purchases of Ocwen stock.  ¶125.

---

[5] According to the Complaint, Ocwen's Head of Servicing emailed Faris in 2014 to complain that REALServicing was "an absolute train wreck." ¶¶10, 113, 179.

The first disclosure occurred on August 12, 2014, when Ocwen issued a press release stating, among other things, that: (a) its financial statements for 2013 and the first quarter of 2014 could no longer be relied upon; (b) it had overstated its pre-tax income for the first quarter of 2014 by almost 20%; and (c) its internal controls over financial reporting suffered from a material weakness.  On this news, Ocwen stock dropped 4.5%.  ¶126.

The second disclosure occurred on October 21, 2014, when the NYDFS issued its open letter to Ocwen recounting the letter-backdating issue.  ¶127.  The NYDFS letter stated that Ocwen "did not notify regulators, borrowers, or investigators of this significant issue, nor did Ocwen personnel conduct due diligence to ensure that the issue was firmly resolved . . ." ¶130. Thus, Ocwen "was not meeting [its] obligations" under various agreements with state and federal authorities, "[a]nd given the issues with Ocwen's systems, it may be impossible to determine the scope of Ocwen's non-compliance."  ¶132.[6]  Ocwen issued a response admitting the backdating of letters "due to software errors in our correspondence systems," and suggesting that only 283 borrowers in New York received backdated letters.  ¶135.  As a result of the information released on October 21, 2014, Ocwen's stock price fell dramatically by over 18%.  ¶136.  After the markets closed on October 21, 2014, Ocwen issued another press release, stating that it wished "to correct its statement in a press release earlier . . . that 283 borrowers in New York received letters with incorrect dates" because it was "aware of additional borrowers in New York who received letters with incorrect dates" but did "not yet know how many such letters there were." ¶137.  The next day, October 22, 2014, the price of Ocwen common stock dropped more than

---

[6] This was a reference to the Consumer Financial Protection Bureau (CFPB) determination that Ocwen's "REALServicing [electronic platform] suffers from fundamental system architecture and design flaws, including a lack of properly managed data, lack of automation, and lack of capacity."  ¶¶10, 112, 156.  As a result of this criticism and the Head of Servicing's email that REALServicing was "an absolute train wreck," Ocwen began transitioning from REALServicing in late 2017 to a different electronic servicing platform licensed by an independent third party.  ¶114.

11%.  *Id.*.  Overall, the price of Ocwen common stock lost almost 30% of its value on October 21-22, 2014, dropping from $26.26 per share to $19.04 per share.  ¶138.

Plaintiffs "specifically relied on the representations set forth above prior to purchasing Ocwen stock."   ¶¶82, 187, 189, 190.   Plaintiffs also relied on Defendants' statements "concerning the effectiveness of Ocwen's disclosure controls and procedures . . . because [they] would ensure that regulatory violations would be publicly disclosed by Ocwen."  ¶91.  Plaintiffs did not know that these representations "were either false or omitted truthful information that rendered the representations materially misleading."  ¶93.  "Had [Plaintiffs] known the truth  . . . [they] would not have purchased Ocwen common stock . . . or, [at least] would not have paid the prices [they] did."  ¶¶92, 192.  The Complaint charges that Defendants Erbey and Faris acted with scienter when making the materially false and misleading statements described above, and that because they were senior executives at the company, their knowledge is imputable to Ocwen.  ¶173, 176, 180.

## **LEGAL CLAIMS**

Count One alleges violations of Section 10(b) of the Exchange Act and Rule 10b-5 against all three Defendants, claiming that they intentionally made materially false and misleading statements to artificially inflate Ocwen's stock price and induce Plaintiffs to buy it.[7]

---

[7] Section 10(b) states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (2012).

Rule 10b–5 provides:

Count Two alleges violations of Section 18 of the Exchange Act against all three Defendants, claiming that they negligently made misleading statements in their quarterly and annual reports upon which Plaintiffs relied.[8]

Count Three alleges violations of Section 20(a) of the Exchange Act against Defendants Erbey and Faris by virtue of their "controlling person" status at Ocwen, and claims that they substantially participated in the alleged wrongs.

Count Four alleges common law fraud against all three Defendants in that they knowingly made material misrepresentations and concealed material facts from Plaintiffs, knowing that Plaintiffs would rely on these misrepresentations and be induced to purchase Ocwen's common stock at inflated prices.

Count Five alleges common law negligent misrepresentation against all three Defendants, claiming that Defendants Erbey and Faris breached their duty to exercise reasonable care and made statements that they knew, or should have known, to be false in order to induce Plaintiffs to purchase Ocwen common stock.

---

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (2012).

[8] Under Section 18, a plaintiff must only plead and prove that the defendant made or caused to be made a material misstatement or omission in a document filed with the Securities Exchange Commission and that the plaintiff relied on the misstatement or omission. *Magna Inv. Corp. v. John Does One Through Two Hundred*, 931 F.2d 38, 39 (11th Cir. 1991). A Section 18 claim, however, does not require that defendants acted with scienter or any particular state of mind. *Id.*

Defendants seek to dismiss all five counts to the extent they raise issues concerning Ocwen's disclosure controls and are predicated on Ocwen's statements made on October 31, 2013, and May 1, 2014. Defendants contend that these claims do not state a claim for which relief can be granted under Rule 12(b)(6), and that they do not satisfy the heightened pleading requirements of Rule 9(b) or the PSLRA.

Specifically, Defendants argue that Faris' October 31, 2013 statement constitutes "puffery" in that it was a "generalized and non-verifiable corporate statement[]" that is non-actionable. Defendants also claim that the Complaint fails to adequately allege Faris' scienter when he made the statement, and that two facts actually negate his scienter, namely that (i) he did not sell any shares of Ocwen stock during the period at issue, and (ii) on the same day Faris made the statement, Ocwen announced a $500 million stock buyback program. DE 43 at 3-4.

With regard to Erbey's May 1, 2014 statement, Defendants argue that the Complaint fails to allege that Ocwen's compliance with the NMS was a not competitive advantage, and therefore, Plaintiffs have not demonstrated that the statement is false. Defendants also claim that the Complaint "omits any mention of Mr. Erbey's state of mind" when he made the statement, and thus, Plaintiffs have not adequately alleged his scienter. As with Faris, Defendants contend that the facts actually negate scienter because Erbey did not sell any shares of Ocwen stock during the period at issue, and "the Ocwen stock buyback program . . . continued well after Mr. Erbey's May 1, 2014 Statement." DE 43 at 4.

## LEGAL STANDARDS

### 1.   Motion to Dismiss Standard

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion to dismiss will be granted if the plaintiff fails to state a claim for which relief can be granted. According to the

federal rules, a claimant must only state "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pled factual allegations in the complaint, as well as all attachments thereto, and evaluates all plausible inferences derived from those facts in favor of the Plaintiff.. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a plaintiff need not state in detail the facts upon which he bases his claim, Rule 8(a)(2) "still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id.* at 555 n. 3. In other words, a plaintiff's pleading obligation requires "more than labels and conclusions." *Id.* at 555; *see also Pafumi v. Davidson*, No. 05–61679–CIV, 2007 WL 1729969, at *2 (S.D. Fla. June 14, 2007) (J. Cohn).

### 2. <u>Heightened Pleading Standard for Fraud under Rule 9(b)</u>

In addition to the usual the notice pleading standard under Rule 8, allegations of fraud require a plaintiff to state "with particularity the circumstances constituting the fraud." *100079 Canada, Inc. v. Stiefel Labs., Inc*., No. 11-22389-CIV, 2011 WL 13116079, at *6 (S.D. Fla. Nov. 30, 2011) (J. Scola) (citing Fed. R. Civ. P. 9(b)). The Eleventh Circuit has interpreted this to mean that the complaint must set forth (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud. *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (noting that while Rule 9(b) requires the circumstances of the fraud

to be pled with particularity, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally").

Here, Plaintiffs' claims in Counts Four and Five for common law fraud and negligent misrepresentation are subject to Rule 9(b)'s heightened pleading requirements. *Broadway Gate Master Fund, Ltd. v. Ocwen Fin. Corp.*, No. 16-80056-CIV-WPD, 2016 WL 9413421, at *3 (S.D. Fla. June 29, 2016) (J. Dimitrouleas). Specifically, the elements of Florida common law fraud are that: (1) the defendant made a false statement or omission of material fact; (2) the defendant knew the statement was false; (3) the statement was made for the purpose of inducing plaintiff to rely on it; (4) plaintiff's reliance was reasonable; and (5) plaintiff suffered damages. *Id*. The elements of Florida common law negligent misrepresentation are: (1) the defendant made a misrepresentation of material fact; (2) the defendant either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the defendant intended to induce another to act on the misrepresentation; and (4) an injury resulted to the plaintiff who acted in justifiable reliance upon the misrepresentation. *Id.*

### 3. <u>Heightened Pleading Standard for PSLRA claims</u>

The PSLRA imposes an even higher pleading requirement on Section 10(b) and Rule 10b-5 claims and requires the plaintiff to set forth with particularity "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* (quoting 15 U.S.C. § 78u–4(b)(1)). Further, the plaintiff must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [*i.e.*, scienter]." 15 U.S.C. §

78u–4(b)(2). "If these PSLRA pleading requirements are not satisfied, the court 'shall' dismiss" those counts. *FindWhat Investor Group*, 658 F.3d at 1296-97 (citing 15 U.S.C. § 78u–4(b)(3)(A)).

Thus, to survive a motion to dismiss, a claim brought under Section 10(b) or Rule 10b–5 must satisfy (1) the federal notice pleading requirements of Rule 8; (2) the special fraud pleading requirements of 9(b); and (3) the additional pleading requirements imposed by the PSLRA. *In re: Altisource Portfolio Sols., S.A. Sec. Litig.*, No. 14-81156-CIV-WPD, 2015 WL 11988900, at *2 (S.D. Fla. Dec. 22, 2015) (J. Dimitrouleas).

In order to state a claim under Section 10(b) and Rule 10b–5, a plaintiff must allege the following: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1192 (2013).

The element of scienter, which is at issue here, requires a showing of

either an "intent to deceive, manipulate, or defraud," or "severe recklessness." "Severe recklessness" is a term reserved for those highly unreasonable omissions or misrepresentations that involve "extreme departure" from the standards of ordinary care and that present a danger of misleading buyers or sellers which is either known to the defendant or is "so obvious" that the defendant must have been aware of it.

*In re: Altisource Portfolio Sols., S.A. Sec. Litig.*, 2015 WL 11988900, at *5 (quoting *Mizzaro v. Home Depot, Inc*., 544 F.3d 1230, 1238 (11th Cir. 2008).

### 4.   Judicial Notice

In determining whether to grant a Rule 12(b)(6) motion, the Court primarily considers the allegations in the complaint, however, when a plaintiff refers to documents in the complaint that are "central to the plaintiff's claims," the Court "may consider the documents part of the

pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require the conversion of the motion into a motion for summary judgment." *In re: Altisource Portfolio Sols., S.A. Sec. Litig.*, 2015 WL 11988900, at *3 (quoting *Brooks v. Blue Cross & Blue Shield of Florida, Inc*., 116 F.3d 1364, 1369 (11th Cir. 1997)). Additionally, the Eleventh Circuit has expressly held that a court may judicially notice relevant documents legally required by, and publicly filed with, the Securities and Exchange Commission ("SEC"). *See Bryant v. Avado Brands, Inc*., 187 F.3d 1271, 1276–81 (11th Cir. 1999).

## DISCUSSION

At the outset, the Court finds that Defendants' Motion to Dismiss does not implicate Count Two. That Count alleges that Defendants violated of Section 18 of the Exchange Act by filing misleading reports with the SEC upon which Plaintiffs relied. Count Two is not predicated on the allegedly false statements Defendants made on either October 31, 2013 or May 1, 2014. Accordingly, Defendants' Motion to Dismiss is denied as moot with regard to Count Two.

### 1.   The October 31, 2013 Statement

On its face, the Complaint satisfies Rule 9(b)'s heightened pleading requirements as to this first statement because the allegations are made with the requisite specificity. The Complaint alleges that on October 31, 2013, during an investor phone call, Faris stated that Ocwen had been "careful to assure . . . strong compliance" during its transfer of the ResCap loans. *See* Complaint at ¶¶8, 74, 153. The Complaint also alleges that Plaintiffs were misled by this statement because they later learned that Defendants had not complied with their regulatory requirements (*id.* at ¶¶9, 108, 123, 129), that Defendants knew or should have known that Ocwen was not in compliance, and that Defendants benefitted from this misrepresentation because it induced Plaintiffs to invest in Ocwen at inflated prices. *Id.* at ¶¶72, 90. Thus, to the extent the

October 31, 2013 statement is the predicate for Counts Four and Five (common law fraud and negligent misrepresentation), the Court finds that the allegations in the Complaint are sufficient. *See Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1281–82 (S.D. Fla. 2008) (J. Ungaro) (Rule 9(b)'s heightened pleading requirement satisfied where the complaint pled in detail what statements were materially false (e.g., statements during investor conference calls that defendant was a conservative lender), why defendant knew or should have known that the statements were false (because defendant was making risky loans to borrowers without properly investigating their creditworthiness), and what defendant stood to gain in making the statements (e.g., artificially high stock prices)).

For the October 31, 2013 statement to be used as a predicate for Count One's claims under Section 10(b) and Rule 10b-5, the Complaint must satisfy the additional criteria of the PSLRA. "Rule 10b–5 prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements . . . not misleading.'" *In re Ocwen Fin. Corp. Sec. Litig.,* No. 14-81057-CIV-WPD, 2015 WL 12780961, at *2 (S.D. Fla. Dec. 22, 2015) (J. Dimitrouleas) (quoting 17 C.F.R. § 240.10b–5(b)). "A statement is misleading if in light of the facts existing at the time of the statement a reasonable investor, in the exercise of due care, would have been misled by it." *Id.* (quoting *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011)). Under Section 10(b) and Rule 10b–5, "a plaintiff must show that the [defendant's] statements were misleading as to a material fact." *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).

Defendants contend that Faris' October 31, 2013 statement regarding Ocwen's "strong compliance" cannot support a claim under Section 10(b) or Rule 10b-5 because it is mere puffery, not a statement of fact, and thus, it cannot be shown to be false.

### a.  **Puffery**

"A statement that is vague, generalized, non-verifiable, or mere corporate puffery is immaterial because a reasonable investor would not make a decision based on such a statement." *Thorpe v. Walter Inv. Mgmt., Corp.*, No. 14-CV-20880, 2014 WL 11961964, at *11 (S.D. Fla. Dec. 23, 2014) (J. Ungaro). As a result, such statements are inactionable as a matter of law and cannot provide a basis for maintaining a claim under Section 10(b) or Rule 10b–5.  *Id.*

In *Thorpe*, the court ruled that the following statements regarding the defendant's compliance and internal controls constituted inactionable puffery:

- Statement touting the Company's "active portfolio management—to improve servicing, regulatory compliance and credit performance," "grounded in the long-term value proposition we offer clients for improved credit performance and regulatory compliance;" and

- Statement touting the Company's "culture of compliance: regulatory compliance capabilities remain at the 'top of list' in terms of ability to win new business."

By contrast, the following are examples of statements the court in *Thorpe* deemed to be beyond mere puffery and thus, actionable:

- Statement touting the Company's "culture of compliance—strong independent controls and processes for monitoring and managing compliance;"

- Company's CEO stated "[w]e have a solid platform with distinct advantages . . . [w]e continue to execute for our clients by delivering strong portfolio performance in a regulatory-compliant matter."

- Company's CFO stated "[w]e're very comfortable and confident that our business practices meet all the requirements out there. You can go through the CFPB's examination manual or any of the other information you might read publicly about what the best practices are in this business and we follow those very, very stridently."

- Company's COO stated "[w]e put so much emphasis on our day-to-day activities of compliance" and "[s]o where there's opportunities . . . [but] we don't see that it's well-defined within state regulatory requirements, we're going to pass on that."

- Company's Chief Compliance Officer stated "we review law changes and go through implementation to make sure we remain on track. Next, we prepare policies and procedures, forms and employee alerts, and all of those are reviewed by the compliance department before they're implemented."

- Company presentation stating "we aggressively maintain compliance with all federal and state requirements and laws."

- Company's CEO stated "[w]e have achieved this while maintaining high standards of performance and compliance across the entire platform."

*Thorpe*, 2014 WL 11961964, at *2-4, *12.

As the court in *Thorpe* noted, "[d]efendants are involved in a heavily regulated industry and their statements relating to compliance with various state and federal laws and the internal controls for ensuring compliance were more than mere puffery." *Id.* at *12. *See also In re Ocwen Fin. Corp. Sec. Litig.*, No. 14-81057-CIV-WPD, 2015 WL 12780961, at *3 (comparing aspirational statements of compliance with "affirmative misrepresentation[s] that the corporation is in compliance [which are] actionable").

Similarly, here, Faris' October 31, 2013 statement that Ocwen had been "careful to assure . . . strong compliance" during the transfer of the newly-acquired ResCap loans to its REALServicing platform, is a "verifiable and specific factual statement," particularly when read in context. According to the Complaint, Faris made this statement to explain why the loan transfer was more expensive than expected. Faris' explanation that Ocwen's emphasis on compliance resulted in a costlier loan transfer is the sort of factual averment upon which investors would reasonably rely in their decision-making and is not mere aspirational corporate puffery.

This Court also finds that Plaintiffs have adequately alleged why the October 31st statement was false when made. In particular, the Complaint alleges that a subsequent investigation by NYDFS which revealed that Ocwen had been "backdating . . . potentially

hundreds of thousands of letters to borrowers" (Complaint at ¶9), and that Ocwen ultimately acknowledged in a consent order that it had been backdating letters to borrowers "for years."  *Id.* These claims are sufficient to support an allegation at this stage that Ocwen was in violation of the NMS at the time Faris made the October 31st statement.  Additionally, the Complaint alleges that Defendants ignored an employee when he reported the backdating problem in November 2013 and again in April 2014, thus revealing Ocwen's failure to investigate or disclose the problem once it was on notice.  *Id.* at ¶¶108, 123, 129.  The Complaint also supports the claim that Ocwen was not meeting its regulatory obligations by alleging that an Ocwen executive acknowledged in an email that its electronic loan servicing platform, REALServicing, was "an absolute train wreck."  *Id.* at ¶10.  Thus, the Complaint adequately alleges facts to support the claim that Faris' October 31, 2013 statement, upon which Plaintiffs relied in deciding to invest in Ocwen, was false.  *See Thorpe,* 2014 WL 11961964 at *13 (plaintiffs properly relied on internet postings, consumer complaints, subsequent lawsuits and a government investigation to show that defendants' statements regarding compliance were false).

> **b.  Loss Causation**

The Court rejects Defendants' argument that Plaintiffs failed to adequately allege loss causation because the corrective disclosures on October 21, 2014 do not reference the transfer of the ResCap loans.  The Court finds that viewed in the light most favorable to Plaintiff, the subsequent corrective disclosures did in fact refute the subject matter of Faris' October 31st statement, namely, that Ocwen was not in compliance with its regulatory requirements. "To be corrective, [a] disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation . . ." *Meyer v. Greene*, 710 F.3d 1189, 1197 (11th Cir. 2013) (citation omitted).

   **c.   Scienter**

Defendants argue that the Complaint fails to adequately allege Faris' scienter when he made the October 31, 2013 statement.  This Court agrees.  "[I]n order to sufficiently allege scienter, a plaintiff must allege facts from which a reasonable person would infer that it is at least as likely as not that the individual high-ranking defendants either orchestrated the alleged fraud (and thus always knew about it), learned about the alleged fraud, or were otherwise severely reckless in not learning of the alleged fraud when they made the purportedly false or misleading statements." *Thorpe*, 2014 WL 11961964, at *15.

First, the allegation that Faris "knew that Ocwen was not in compliance with regulatory standards because he sat on Ocwen's Compliance Committee" is insufficient.  Plaintiffs essentially allege that Faris "must have" received information about the back-dated letters or Ocwen's general lack of compliance with regulatory regulations as a result of his position on the Compliance Committee, but the Complaint does not reference any specific report or statement that was produced to the members of that committee.  *In re Sanofi Sec. Litig.,* 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016) (court declined to infer that defendant had knowledge of an illegal marketing scheme by virtue of his membership on the compliance committee) (citing *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.")).

Second, the timing of the Complaint's allegations fail to establish that Faris operated with the requisite level of scienter on October 31, 2013.  In particular, Plaintiffs rely on the fact that an Ocwen employee discovered and reported the backdating scheme to Ocwen management as evidence of Faris' scienter, but the Complaint states that this revelation did not occur until

November 2013, the month *after* Faris made his statement regarding strong compliance on the investor conference call.  Thus, this allegation cannot form the basis of Faris' scienter. Moreover, the Complaint only makes the general allegation that Defendants knew or recklessly disregarded the fact that Ocwen was not in compliance with its regulatory requirements "throughout 2014."  There are no specific facts alleged in the Complaint to support the conclusory allegation that Faris acted with severe recklessness when he made his statement on October 31, 2013.

Since the Complaint as pled is insufficient to plausibly infer that Faris acted with the requisite intent under the PSLRA, the Court finds that Faris' October 31st statement cannot be used as a predicate to support Counts One or Three.[9]

### 2.   The May 1, 2014 Statement

Similar to Faris' October 31st statement, this Court finds that the Complaint's allegations regarding Erbey's press release dated May 1, 2014 satisfy the heightened pleading standard of Rule 9(b) to provide the factual bases for Counts Four and Five (common law fraud and negligent misrepresentation).  Specifically, in his May 1, 2014 press release, Erbey stated that Defendants considered their "National Mortgage Settlement compliance . . . to be [a] substantial competitive advantage[]."  The Complaint provides details regarding the speaker, date, and content of the statement, alleges that Plaintiffs were misled by this statement because they later learned that Defendants had not complied with regulatory requirements, that Defendants knew or

---

[9]   Given that Plaintiffs have failed to plead a primary violation under Section 10(b) or Rule 10b–5 of the Exchange Act with regard to Faris' October 31st statement, it follows that to the extent the Section 20(a) claim in Count Three is also predicated on this statement, it must fail for the same reason.  *Marrari v. Med. Staffing Network Holdings, Inc*., 395 F. Supp. 2d 1169, 1190 (S.D. Fla. 2005) (J. Dimitrouleas) ("to the extent that the Section 20(a) Count rests upon violations of Section 10(b) or Rule 10b–5 that have been dismissed . . . the Court must also dismiss the Section 20(a) Count").

should have known that they were not in compliance, and that Defendants benefitted from this misrepresentation because it induced Plaintiffs to invest in Ocwen.

Defendants contend that Plaintiffs failed to "offer allegations that would make the May 2014 statement false," (i.e., that Ocwen's compliance was not a competitive advantage), which "defeats the element of falsity." DE 43 at 14. This Court declines to adopt this narrow reading of Erbey's statement. The corrective disclosure "need not precisely mirror the earlier misrepresentation;" it must only relate back to the misrepresentation. *Meyer*, 710 F.3d at 1197. Thus, Plaintiffs are not required to allege that regulatory compliance did not give Ocwen a competitive advantage for the statement to be false. Rather, it was Erbey's assertion that Ocwen was in fact complying with the NMS that constitutes the falsity. The Court finds that these facts are sufficiently pled in the Complaint.

In *Broadway Gate Master Fund, Ltd. v. Ocwen Fin. Corp.*, No. 16-80056-CIV-WPD, 2016 WL 9413421 (S.D. Fla. June 29, 2016), Judge Dimitrouleas was also confronted with Erbey's May 1, 2014 press release in the context of a motion to dismiss Section 10(b) and Rule 10b-5 claims. Judge Dimitrouleas held that the alleged falsity of this very statement had been adequately pled where the complaint alleged, as it does here, that Ocwen had backdated letters in contravention of NMS standards. *Id.* at *8. Moreover, given that the complaint in *Broadway Gate* alleged that the backdating was discovered by an Ocwen employee in November 2013, as is alleged in this case, Judge Dimitrouleas held that the plaintiffs in *Broadway Gate* adequately pled that Erbey and Ocwen had the requisite scienter when the May 1, 2014 press release was issued. *Id.* (finding that "Erbey's knowledge and the Vice President of Compliance's knowledge are imputable to Defendant Ocwen"). Although, as Defendants point out, this Court is not bound by Judge Dimitrouleas' opinion, the Court considers the reasoning to be persuasive, particularly

in light of the additional legal authority regarding scienter cited below, and thus, will adopt it here.

As the United States Supreme Court has held, in determining whether the plaintiff "has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 323–24 (2007).  Here, the only nonculpable explanation for Erbey's May 1, 2014 press release is that he did not know Ocwen was in violation of the NMS when he issued it.  In light of the totality of the Complaint's factual allegations, which must be accepted as true at this stage, the Court does not find this alternative explanation to defeat scienter.

It is well settled that in evaluating scienter under the PSLRA, "allegations must be considered collectively . . . the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."  *Id.* at 325-26.  "[T]he inference of scienter can arise from an aggregation of particularized facts, even if each individual fact standing alone does not create a sufficiently strong inference." *In re Spear & Jackson Sec. Litig*., 399 F. Supp. 2d 1350, 1358 (S.D. Fla. 2005) (J. Middlebrooks) (citing *Phillips v. Scientific–Atlanta, Inc*., 374 F.3d 1015, 1017 (11th Cir. 2004)).  An inference of scienter may also arise where the defendants "knew facts or had access to information suggesting that their public statements were not accurate . . . or . . . failed to check information they had a duty to monitor." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 2010 WL 961596, at *10 (S.D.N.Y. Mar. 17, 2010) (plaintiff must specifically identify the reports or statements and the dates or time frame when defendants were put on notice of contradictory information) (quoting *Novak*, 216 F.3d at 306).

Here, the allegation that Defendants admitted in a 2014 consent order with the NYDFS that the backdating scheme had been going on "for years" is sufficient to infer that Erbey was aware of the scheme when he made the May 1, 2014 statement.  This inference is bolstered by the Complaint's factual allegations that an employee reported the backdating problem to Ocwen in November 2013, and again in April 2014, one month before Erbey's press release.  Although the Complaint does not specifically allege that Ocwen's Vice President of Compliance conveyed the backdating discovery to Erbey, given Erbey's status as a high level executive, there is a plausible inference that he was aware of the backdating scheme. "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[A] plaintiff may, under certain circumstances, successfully plead scienter as to an individual executive defendant without allegations regarding that defendant's direct knowledge." *Robb v. Fitbit Inc*., 2017 WL 219673, at *3 (N.D. Cal. Jan. 19, 2017).  The Ninth Circuit has held that courts may

> impute scienter to individual defendants in some situations, for example, where we find that a company's public statements are so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication.

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc*., 774 F.3d 598, 607 (9th Cir. 2014) (quotation and citation omitted) (emphasis in original).  The Ninth Circuit explained that "allegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement" when the allegations, "read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008) (quotation and citation omitted).  In the alternative, allegations against corporate executives "may independently satisfy the PSLRA where they are particular

and suggest that [the individual] defendants had *actual access* to the disputed information." *Id.* (emphasis added).

Here, the Court finds that viewed in the light most favorable to Plaintiffs, the particularized allegation about the November 2013 and April 2014 reports regarding the backdating issue, the claim that the discovery was reported to the Vice President of Compliance, and Erbey's high-ranking position at Ocwen, suggest that at a minimum, Erbey would have had actual access to the reported discovery. The facts alleged in the Complaint regarding the timing and significance of the backdating discovery, the importance of the May 1, 2014 press release in bolstering investor confidence, and that the statement was "so dramatically false" in claiming that Ocwen had been and continued to be in compliance with the NMS, raises an inference of scienter that is "cogent and compelling" compared to the alternative explanation -- that Erbey was simply unaware of Ocwen's noncompliance when he issued the May 1st press release. *See Or. Pub. Emps. Ret. Fund*, 774 F.3d at 607. *See also Robb*, 2017 WL 219673, at *6 ("[t]hat plaintiffs' allegations do not directly connect the dots between [the COO's] knowledge and the individual defendants will not be grounds for dismissing the complaint" where there was "a 'cogent and compelling' argument that [the] information . . . would also have been known to the individual defendants"). For these reasons, the Court finds that the allegations regarding the May 1, 2014 press release and Erbey's scienter are a sufficient predicate for the PSLRA claims in Count One.

With regard to the Section 20(a) "control person" liability alleged in Count Three, "[w]hile there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants." *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 409 (S.D.N.Y.

2016) (quoting *In re Marsh & McLennan Companies, Inc. Sec. Litig.*, 501 F.Supp.2d 452, 481 (S.D.N.Y. 2006).  Here, the Complaint alleges that Defendants Erbey and Faris are liable as "control persons," and given that the Court has found that the Complaint properly alleges a cause of action under Count One with regard to the May 1, 2014 press release, and that Defendants do not specifically dispute Erbey and Faris' control over Ocwen at this stage of the proceedings, the Court finds that the May 1, 2014 press release is a proper predicate for establishing control person liability under Count Three.  *See In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d at 1359 (noting that "[o]ther courts in the 11th Circuit have held that allegations that individuals, because of their management and/or director positions, could control a company's general affairs, including the content of public statements and financial statements disseminated by the company, are sufficient to state a cause of action for controlling person liability") (collecting cases).

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (DE 43) is **GRANTED IN PART** in that Faris' October 31, 2013 statement, as alleged, is not a proper predicate for Counts One and Three.  Defendants' Motion to Dismiss is **DENIED** in all other respects.


**DONE AND ORDERED** in Chambers this 4th day of October, 2018, at West Palm Beach in the Southern District of Florida.


BRUCE REINHART
UNITED STATES MAGISTRATE JUDGE